SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2017 OCT 27  PM 3: 45

DEPUTY CLERK _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| THE STATE OF TEXAS, ex rel, | § | |
| MARK ADAMS, | § | **317 - CV 2977 - M** |
| | § | |
| Relator, | § | |
| v. | § | No. |
| | § | |
| MEDOC HEALTH SERVICES, L.L.C., and | § | |
| JOHN DOES 1-100, | § | |
| | § | |
| Defendants. | § | |

## RELATOR'S ORIGINAL COMPLAINT

Relator Mark Adams, pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C § 3729-3733 ("FCA") and the Texas Human Resources Code §32.039 *et seq.* (the "TFCA"), files this Complaint against Medoc Health Services, L.L.C. and John Does 1-100 (collectively "Defendants") and in support thereof, Relator alleges as follows:

### JURISDICTION AND VENUE

1. This action arises under the Anti-Kickback Statute, the FCA, the Stark Statute, and the TFCA. This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(b), 28 U.S.C §§ 1345 and 1367(a).

2. Venue is proper in the Northern District of Texas, pursuant to 28 U.S.C. § 1391(a) and 31 U.S.C. § 3732(a).

### PARTIES

3. Plaintiff, the United States of America, acting through the Department of Health and Human Services ("DHHS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare").

4. Plaintiff, the State of Texas, brings this action under the Texas Human Resources Code §32.039 *et seq.* The Medicaid program is a joint Federal-state program that pays certain healthcare costs for persons who are qualified to receive covered benefits as a result of their poor economic situation. The Federal government reimburses States for a percentage of the payments made by States under their Medicaid programs, typically at a rate of 50%.

5. Relator Mark Adams ("Relator") is a resident of Massachusetts who is employed as an Executive Vice President and the National Director of Sales and Marketing for Cambridge Therapeutic Technologies, L.L.C. ("Cambridge"). Cambridge provides generic prescription medications to providers, including physicians and pharmacists. In his capacity over sales and marketing, Relator was responsible for client relations with Medoc Health Services L.L.C. ("Medoc"). In the course of his employment, a dispute arose between Cambridge and Medoc over collection of payment for prescriptions which were delivered to and signed for by Medoc's agents. In total, Medoc has denied receipt of approximately $1.1MM worth of prescription creams and gels. As a result of Relator's investigation into the "missing" medication, and communication with confidential informants inside of Medoc, Relator uncovered the scheme set forth herein.

6. Defendant Medoc is a privately held Texas limited liability company with its principle place of business in Dallas, Texas. Its registered agent is William W. Meier III, and its registered address is 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202. Medoc's primary business is to provide managed services to physicians' groups and pharmacies. Medoc is jointly owned by K&S Biotherapeutics, L.L.C.[1], Mark Schneider, Michael Schneider, Performance Biomedical, L.L.C., and Radix Resources, L.L.C. Medoc controls each of the Defendant John Doe pharmacies and physicians' groups, and directs their activities, including running the fraudulent schemes described herein.

7. Defendants John Does 1-100 are pharmacies and physicians' groups whose services are controlled by Medoc, including participation in the fraudulent schemes described herein. Upon information and belief, Medoc-controlled physicians and pharmacies include, but are not limited to: Lone Star Orthopedic and Spine Specialists, P.L.L.C.[2]; Dr. Gary Lawton, Eco Pharmacy

---

[1] K&S Biotherapeutics is owned by Kevin Kuykendall. Kevin Kuykendall is the Chief Executive Officer of Medoc Health Services, L.L.C.

[2] Physicians include Dr. Gurpreet S. Bajaj, Dr. Von L. Evans, Jr., Dr. Jeffrey J. Ratusznik, Dr. John A. Thomas, and Christopher P. Werner.

Galaxy Pharma Inc., d/b/a WestPoint Pharmacy, Saratoga Pharmacy, Doctor's Specialty Pharmacy, Premier Drug, Total RX One, Oklahoma Compound Solutions, n/k/a Premier Pharmacy, Smile Pharmacy, Pharmacare, AZ Baywood, Longhorn Pharmacy, WTEE Pharmacy, n/k/a Fort Worth Specialty, Pro Pharmacy, and Pure Pharmacy.  Upon information and belief, Medoc's network contains approximately 500 physicians.

## THE LAW

8.  The federal Anti-Kickback Statute 42 U.S.C § 1320(b) bars anyone from offering to pay or paying "remuneration" whether "directly, indirectly, overtly or covertly, in cash or in kind" to induce the purchase of goods "for which payment may be made in whole or in part under a Federal health care program."  The purpose of the statute is to "protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.[3]

9.  The False Claims Act, 31 U.S.C. § 3729-3733, in turn bars anyone from causing the submission of false claims to the government, directly or indirectly, as the government will not knowingly pay for any purchase tainted by a bribe, kickback or other inducement.  Requests for reimbursement of any such tainted purchases are false claims and actionable under the FCA.

10.  Commonly known as the "Stark Statute," 42 U.S.C. § 1395nn prohibits pharmacies and other enumerated entities who provide designated health services from submitting Medicare claims for such services based on patient referrals from physicians with a financial relationship to the pharmacy and/or enumerated entity, and prohibits Medicare from paying such claims.

11.  Tex. Human. Res. Code Ann. § 36.002 governs Medicaid fraud prevention and provides an avenue for recovery similar to that of the FCA.  This statute prohibits, generally, the submission of false statements or misrepresentation of a material fact to in pursuit of payment from Medicaid.

12.  Relator brings this *qui tam* action to challenge Defendants' widespread scheme to defraud Medicare and Medicaid by (i) paying illegal kickbacks to physicians to induce them to have their expensive patient prescriptions filled through Medoc-controlled pharmacies, (ii)

---

[3] Office of the Inspector General, Federal Anti-Kickback Law and Regulatory Safe Harbors Fact Sheet, November 1999

charging Medicare and Medicaid for prescriptions that were never given to the beneficiaries, and (iii) intentionally over prescribing medications for the sole purpose of generating revenue. .

## THE FRAUD SCHEME

13. Upon information and belief, Defendant Medoc was engaged in a scheme whereby Medoc entered into compensation arrangements with physicians in violation of the Stark Statute, specifically by paying the physicians (who referred designated health services) under agreements which did not fall within any Stark Statute exception.

14. The agreements required physicians to send patient prescriptions to a Medoc-controlled call center called "Millton", and Medoc would in turn shuttle the prescriptions to pharmacies operating under its direction.[4] Neither the physician nor the patient determined which pharmacy would fill its prescription, and patients were routinely denied a choice of pharmacy. In fact, Medoc would decide where to send the prescription.

15. Internally, physicians were referred to as "investors." Medoc routinely engaged in conference calls with its physician "investors" to discuss "strategy to increase profits" and "scripting protocols."

16. Medoc also placed its employees inside the physicians' offices to direct and control pharmacy-related activities. For example, Medoc employee Brandi Allen worked inside of Lone Star Orthopedic and Spine Specialists, P.L.L.C. Justin Mourning, the Vice President of MSO management and Strategic Accounts for Medoc, directed that "any request for the following physicians should be run directly through Brandi: Bajaj, John Thomas, Werner, Ratusznik, Evans."

17. Upon information and belief, Medoc would alter the prescriptions sent in by the physicians to reflect prescription for an alternative product - one that was usually more profitable for Medoc.[5] Medoc also had a practice of filling prescriptions with non-FDA approved kits and patches for pain that were not medically necessary and regularly over prescribed. For example,

---

[4] Upon information and belief, prescriptions were often issued without a physician's signature, and were signed by the Pharmacy and/or physician after the prescriptions were dispensed to the patients and just before the insurers could perform an audit.

[5] Some physicians complained about Medoc's interference. On February 15, 2017, Brandi Allen wrote, "Dr. Thomas was wondering why patients are receiving pain complements (omeprazole and naproxen) when he is only writing for the pain cream. He said it looks like were pushing things on patients and he only wants the things he checks."

Patient A, a 47 year old male in Edmond, Oklahoma, was prescribed Diclofenac Gel 3%, Lidocaine Ointment 5%, and Lidocaine Pads 5%. He was permitted eleven (11) additional refills of these medications, which carried a cost of approximately $300 per tube.

18. Upon information and belief, Medoc has formed hundreds of L.L.Cs, and the cooperating physicians each owned a percentage of the L.L.Cs.   Physicians were paid distributions and/or dividends amounting to approximately 20-30% of the net adjudication of the prescriptions.  Upon information and belief, Medoc has entered into kickback agreements with more than 500 physicians.

19. Cambridge supplied various prescription medications, including gels and creams, to Medoc-controlled pharmacies.  The purchase orders for prescription medications were issued by Medoc, and payment for the prescriptions usually came from Medoc.  Medoc was Cambridge's largest account in terms of sales of pricey prescription creams and gels at the time the orders were placed.

20. Upon information and belief, Medoc targeted small, struggling pharmacies by offering financial incentives for their business.  Medoc offered stock agreements to these pharmacies and split drug adjudication amounts.  For example, Saratoga Pharmacy entered into an agreement with PharmLogix, L.L.C.[6] for the provision of "centralized prescription drug or medication order processing and adjudication services" in exchange for "a service fee equal to two percent (2.0%) _of Gross Adjudicated Revenue each month." Medoc then sold shares of the pharmacy management L.L.C.'s to the physicians.

21. Upon information and belief, Medoc then began purchasing pharmacies it controlled. For example, Doctor's Specialty Pharmacy was created on September 16, 2010 by James H. Webb[7] and Ted Groesbeck.  However, on February 1, 2016, James Webb sold Doctor's Specialty Pharmacy to Cain Pharmacy Management[8], L.L.C. for just $10.00. Medoc also took control of Total RX One, Saratoga Pharmacy, and Westpoint Pharmacy.  These pharmacies served as "burners" which processed thousands of prescriptions from Medoc-controlled physicians groups.

22. Upon information and belief, Medoc-controlled pharmacies grossly inflated the cost of gels and creams purchased from Cambridge.  For example, between March 2, 2016 and October

---

[6] Pharmlogix L.L.C. was owned by Kevin Kuykendall, Medoc's CEO.
[7] In 2016, James Webb's company, Preferred Imaging LLC, paid $3,510,000.00 to resolve allegations that Preferred Imaging improperly billed Medicare and Medicaid for services performed without proper medical supervision in violation of the False Claims Act and the Texas Medicaid Fraud Prevention Act.
[8] Cain Pharmacy Management, L.L.C. was also owned by Kevin Kuykendall, Medoc's CEO.

31, 2016, Eco Pharmacy of Austin billed insurers, including Medicare and Medicaid, $8,463,521.50 for prescriptions which carried an aggregate cost of $4,319,824.01. Upon information and belief, these mark-up practices extended across all Medoc-controlled pharmacies and involved the defrauding of dozens of Pharmacy Benefit Managers ("PBM"), including Blue Cross Blue Shield of Texas and Prime Therapeutic, who was the PBM for Blue Cross Blue Shield of Texas.

23. Upon information and belief, Medoc failed to notify state regulatory agencies regarding the transfer of licenses between pharmacies, including Doctor's Specialty Pharmacy.

24. Upon information and belief, Medoc would then hire pharmacists from the previously shuttered pharmacies and require execution of non-disclosure and confidentiality agreements as a condition of employment. For example, registered pharmacist Ajaykumar Jadeja (License #35485) served as a pharmacist for Saratoga Pharmacy. Saratoga Pharmacy, which closed unexpectedly, forwarded patient prescriptions to Doctor's Specialty Pharmacy. Mr. Jadeja was then hired as the Clinical and Operations Manager for Medoc. Medoc then opened Fort Worth Specialty Pharmacy in Saratoga Pharmacy's building and transferred Mr. Jadeja to that facility. Medoc also hired Eco Pharmacy technician Eric Nelson and Total RX One technician Kenny Repster, and required execution of non-disclosure and confidentiality agreements.

25. Upon information and belief, Medoc terminated the services of pharmacists and technicians who refused to go along with Medoc's scheme. Pharmacist Danny Thompson served as the Pharmacist in Charge for Premier Drug in Oklahoma City, Oklahoma. Mr. Thompson and two technicians were let go from their positions following an unannounced November 2016 pharmacy inspection by the state Board. Following the inspection, Mr. Thompson advised Medoc that he would no longer fill prescriptions until certain changes were made to put Premier Drug in regulatory compliance. Medoc then blamed Mr. Thompson and his technicians for a "plummeting adjudication rate." Internal correspondence regarding the termination of the Premier staff included discussion of a plan of action, which included "[Medoc] to ensure Millton is 100% controlling intake, adjudication and TI," "[Medoc] to ensure 100% recommitment by the MSO physicians," and "[Medoc] to monitor daily activity by MSO physician."

26. Upon information and belief, Defendants also regularly encountered a situation where customers, who were Medicare and/or Medicaid beneficiaries, never actually received the filled prescription. A beneficiary may have failed to pick up the prescription from the pharmacy or the

prescription was returned by a third party shipper such as FedEx.  Upon information and belief, there were many patient cases wherein the prescription was presented for payment, never shipped out to the patient, and the payment to Medoc by the PBM was not reversed.  The "Millton" call-center, which was operated by Medoc and processed pharmacy billing, routinely failed to reverse claims to Medicare and Medicaid for prescriptions that were not picked up by patients, returned, or never sent out to the patients.  Instead, the Defendant pharmacies would restock and resell the prescription medication at Medoc's instruction.

27. Upon information and belief, some Medoc controlled pharmacies have been terminated from PBM organizations for having drug shortages - defined as the pharmacy's purchasing invoices not supporting the quantity billed by the pharmacy. These drug shortages were likely the result of (i) restocking and reselling prescription medications that were never picked up by a beneficiary, (ii) moving product between pharmacies and affiliated pain clinics without executing the proper paperwork, and/or (iii) theft of product from Cambridge.[9]

28. Upon information and belief, as a result of the termination of its PBM contracts, Medoc closed pharmacies, without notice to its customers, just prior to a regulatory audit of the pharmacy's practices.  Medoc did this to avoid insurer claw back of adjudicated amounts and exposure of Medoc's practice of substituting the prescribed medication with non-FDA approved products.[10]  Upon information and belief, pharmacy closures were also intended to prevent disclosure to the PBM's and/or state regulatory agencies that the pharmacy licenses were never transferred properly and/or that billing was exaggerated or fraudulent.  In internal Medoc correspondence regarding the closing of Saratoga Pharmacy and opening of Fort Worth Specialty Pharmacy in its place, one employee commented "I think it is crazy to use old Saratoga [phone number] [as] some pbms are still after them."

29. Upon information and belief, Medoc was aware that certain claims in its system required reversal.  However, Medoc instructed its employees not to take action with regard to reversing

---

[9] For example, On March 30, 2016, Doctor's Specialty Pharmacy issued a purchase order for 686 tubes of a pain gel at a cost of approximately $329K.  On April 6, 2016, UPS delivered the shipment to 5601 Granite Pkwy, Plano, TX, which was the address UPS had on file for the pharmacy.  Medoc and the pharmacy denied receipt of the pallet of medication, claiming it did not operate out of that address.  However, while under the ownership of James Webb, the pharmacy did in fact operate at 5601 Granite Parkway.  According to public records, Preferred Imaging then operated out of 5601 Granite Parkway until April, 2016 – the month of delivery. James Webb informed Cambridge on August 28, 2017 that he "had a vague memory of drugs being sent to our office by mistake and we sent them to [the pharmacy] in Dallas."  To date, Medoc and the pharmacy continue to deny receipt of the medication.
[10] In May, 2016, Medoc had 8 open audits with a potential clawback on $12,262,543.19.

claims.  For example, Medoc did not reverse known improper claims at the Smile Pharmacy, despite the urging of a Medoc employee in 2016, until the FBI began investigating the pharmacy in 2017.

30. Upon information and belief, Medoc used facsimile or stamped new prescriptions that the physician did not actually sign.  Medoc would have the prescriptions signed well *after* the prescription was filled.

a. For example, Patient B was a 33 year old male from Dallas, Texas, and was prescribed six (6) different medications on November 11, 2015 by Dr. Andrew Park.  These prescriptions were filled by Medoc, but not signed by the physician until at least April 22, 2017.

b. Patient C was a 67 year old female from Keller, Texas who was prescribed Lidocaine Ointment 5% on May 15, 2015 by Dr. Joel Dacus.  This prescription was filled by Medoc, but not signed by the physician until just prior to a late 2016 audit of Doctor's Specialty Pharmacy by PBM EnvisionRx.

c. Patient D was a 43 year old female from Watauga, Texas who was prescribed Lidocaine Ointment 5% on December 29, 2015 by Dr. Erin Herrmann.  This prescription was filled by Medoc, but not signed by the physician until just prior to a late 2016 audit of Doctor's Specialty Pharmacy by PBM EnvisionRx.

d. Patient E was a 73 year old female from Hurst, Texas who was prescribed Lidocaine Ointment 5% on January 6, 2016 by Dr. Rodolfo Herrera.  This prescription was filled by Medoc, but not signed by the physician until just prior to a late 2016 audit of Doctor's Specialty Pharmacy by PBM EnvisionRx.

e. Patient F was a 77 year old male from Keller, Texas who was prescribed Lidocaine Ointment 5% on January 7, 2016 by Dr. Rodolfo Herrera.  This prescription was filled by Medoc, but not signed by the physician until just prior to a late 2016 audit of Doctor's Specialty Pharmacy by PBM EnvisionRx.

f. Concerning the discovery of unsigned prescriptions in preparation for an audit of Doctor's Specialty Pharmacy, on April 11, 2016 Medoc employee Moky Cheung stated "if we need to get these signed as part of the audit, then we will make that happen."

31. Medoc also handled all of the prescription refills, and would automatically send prescriptions to the patient. Patients often requested Medoc cease sending prescription medications, and Medoc would continue to bill the insurers and PBMs.

32. The extent of the damages to the United States and the State of Texas are currently unknown. However, through its illegal arrangement with physicians groups and pharmacies, Medoc shuttled prescriptions through approximately 10-12 known pharmacies. *According to public records, just one of those pharmacies carried an estimated business income of $35 million dollars over a seven (7) month period.*[11] According to internal documents, the shuttered Saratoga Pharmacy had gross revenue of $25,146,761.24 for the period of 1/1/16 to 6/14/16. Upon information and belief, the value of prescriptions which were billed to Medicare or Medicaid but not actually received by a beneficiary is in the millions of dollars.

## COUNT I
### False Claims Act, 31 U.S.C. § 3729 (a)(1)(A)
### Presenting Claims to Medicare for Designated Health Services
### Rendered as a Result of Violations of the Stark Statute

33. Plaintiffs incorporate by reference all paragraphs of this Complaint set out above as if fully set forth herein.

34. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States government, including those claims for reimbursement for designated health services rendered to patients who were referred by physicians with whom Medoc had entered into a prohibited financial relationships in violation of the Stark Statute.

35. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

36. By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $10,957.00 to $21,916.00 for each violation.

---

[11] *Total Rx Care, LLC v. Great Northern Insurance Company*, Dkt #51, 3:16-cv-2965, (N.D. TX April 14, 2017)

## COUNT II
### False Claims Act, 31 U.S.C. § 3729 (a)(1)(B) and (a)(2)
### Use of False Statements

37. Plaintiffs incorporate by reference all paragraphs of this Complaint set out above as if fully set forth herein.

38. Defendants made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the United States government.

39. Said false records or statements were made with actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false.

40. By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $10,957.00 to $21,916.00 for each violation.

## COUNT III
### TFCA, Tex. Human. Res. Code Ann. § 36.002
### Presenting Claims to Medicaid While Using False Statements and/or
### Misrepresenting of Material facts

41. Plaintiffs incorporate by reference all paragraphs of this Complaint set out above as if fully set forth herein.

42. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of Texas Medicaid program.

43. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

44. By virtue of the false or fraudulent claims made by Defendants, the State of Texas has suffered damages and therefore is entitled to recovery as provided by the TFCA of an amount to be determined at trial, plus a civil penalty of $10,957.00 to $21,916.00 for each violation.

## PRAYER FOR RELIEF

45. WHEREFORE, Relator prays that judgment be entered against Defendants, ordering that:

    a. The Defendants cease and desist from violating the Federal False Claims Acts;

    b. The Defendants pay not less than $10,957.00 and not more than $21,916.00 for each violation of 31 U.S.C. § 3729 *et seq.*, plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

    c. Relator be awarded the maximum Relator's share allowed pursuant to 31 U.S.C. § 3730(d);

    d. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. 3730(d);

    e. Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the damages, penalties, fines, and costs awarded by the Court;

    f. The United States and Relator be awarded such other relief as the Court deems just and proper.

## JURY TRIAL

46. Pursuant to Rule 38 of the Fed. R. Civ. P., Relator demands a trial by jury.

Respectfully submitted,

Steve Sumner
Texas Bar No. 19508500
E-Mail: ssumner@sumnerschick.com
Justin Sumner
Texas Bar No. 24063022
E-Mail: jsumner@sumnerschick.com

Sumner, Schick & Pace, L.L.P.
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219
(214) 965-9229

ATTORNEYS FOR RELATOR