IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No. 3:17-CV-2977-M |
| MEDOC HEALTH SERVICES, LLC, KEVIN KUYKENDALL, SABRINA KUYKENDALL, TRENTON MOODY, MARK SCHNEIDER, MICHAEL SCHNEIDER, MOKY CHEUNG, TOTAL RX CARE, LLC, and CUONG "MICHAEL" NGUYEN, | |
| Defendants. | |

## THE UNITED STATES OF AMERICA'S
## COMPLAINT IN PARTIAL INTERVENTION

1.     The United States of America, on behalf of the United States Department of

Health and Human Services, the Department of Defense, and the Department of Labor,

partially intervenes in this action and brings claims against Defendants Medoc Health

Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Michael

Schneider, Trenton Moody, and Moky Cheung (collectively, the Medoc Defendants), as

well as Total RX Care, LLC f/k/a Total RX Care, Inc., and Cuong "Michael" Nguyen

(collectively, the Total RX Defendants and, together with the Medoc Defendants, the

Defendants) to recover damages and civil penalties under the False Claims Act (FCA), 31

U.S.C. §§ 3729 et seq. and the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b),

as well as common law and equitable theories of fraud, unjust enrichment, and payment by mistake.

## I.    PRELIMINARY STATEMENT

2.    From January 2015 through August 2016, the Medoc Defendants extracted approximately $2 million dollars in kickbacks from three North Texas compounding pharmacies in return for directing federal program patient prescriptions—i.e., prescriptions submitted to and paid for by federal government healthcare programs, including Medicare, Tricare, and Department of Labor healthcare programs—to those pharmacies. These prescriptions came from physicians controlled by the Medoc Defendants through subsidiaries of Defendant Medoc Health Services, LLC.

3.    Specifically, Medoc created over twenty subsidiary entities called MSOs. Medoc co-owned each of the MSOs along with small groups of physician-investors. Through the MSOs, Medoc paid the physician-investors distributions based on referrals sent to Medoc. Medoc then routed the prescriptions—both federal and non-federal—to pharmacies of its choosing for fulfillment. In this way, Medoc was able to control the prescriptions generated by MSO physicians.

4.    The Medoc Defendants masked the kickbacks they demanded and received from two of the pharmacies—Total RX and Midcities—as wages to an "employee." In particular, the Medoc Defendants leveraged their control of hundreds of federal program patient referrals to coerce both Total RX and Midcities into executing sham employment agreements with Defendant Michael Schneider. But Michael Schneider was never a legitimate employee of either Total RX or Midcities. Along with Defendants Kevin

Kuykendall, Trenton Moody, Mark Schneider, and Moky Cheung, Michael Schneider was actually a founder and owner of Medoc.  And his employment agreements were fictions used to funnel illicit kickbacks from Total RX and Midcities back to Medoc and its management, Defendants Kevin Kuykendall, Sabrina Kuykendall, Michael Schneider, Mark Schneider, Trenton Moody, and Moky Cheung.

5.      Defendant Michael Schneider's employment agreement with Total RX purports to begin in March 2015 and last until August 2015; while his employment agreement with Midcities begins in February 2016 and lasts until August 2016.  But these agreements were both shams.  They were executed so the Medoc Defendants could capture a percentage of the federal revenue generated by patient referrals they sent to Total RX and Midcities.  Indeed, Michael Scheider's purported salary was actually calculated based on the federal program patient revenue the Medoc Defendants generated for the pharmacies.  Michael Schneider actually split the "wages" he received from Total RX with his co-Defendants, underscoring that the payments were not wages, but kickbacks.

6.      In return, the Medoc Defendants turned Total RX and Midcities into so-called "federal pharmacies," directing hundreds of prescriptions paid for by Medicare, Tricare, and the Department of Labor to them for fulfillment.

7.      In between these two sham employment agreements, the Medoc Defendants extracted kickbacks from another pharmacy—Doctors Specialty Pharmacy (DSP)— through an above fair market value services agreement.

8.     The agreement provided that DSP would pay a new entity, Vintage Grow Investment Partners I, LLC, 89% of its gross operating income in return for certain purported management services.  In reality, the 89% fee was a kickback that DSP agreed to pay to Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, and Michael Schneider through Vintage Grow in exchange for directing referrals of federal government patient prescriptions to the pharmacy.  In turn, the Medoc Defendants turned DSP into a "federal pharmacy," directing patient prescriptions paid by Medicare, Tricare, and the Department of Labor to DSP for fulfillment while the kickback agreement was in place.

9.     The kickbacks the Medoc Defendants demanded—and received—from Total RX, DSP, and Midcities rendered false each and every claim for payment that those pharmacies submitted to Medicare, Tricare, or the Department of Labor for prescriptions allegedly provided to Medoc MSO referred patients, even if the services were provided exactly as they were billed.

10.     The claims for payment that Total RX, DSP, and Midcities submitted for payment to Medicare, Tricare, and the Department of Labor were tainted by kickbacks during the time period of their respective agreements with the Medoc Defendants in violation of the AKS.  And every claim for payment that Total RX, DSP, or Midcities submitted to Medicare, Tricare, or the Department of Labor for these Medoc-referred patients was a false claim for purposes of the False Claims Act because the referrals were tainted by the kickbacks the Medoc Defendants extracted from the pharmacies.

11.     Defendant Cuong "Michael" Nguyen, by and through Defendant Total RX, knowingly submitted false claims for payment to Medicare, Tricare, and the Department of Labor based on kickback-tainted patient referrals from the Medoc Defendants.

12.     The Medoc Defendants knowingly caused the submission of these false or fraudulent claims to federal healthcare programs.  These claims were generated by Medoc's business model of paying money to physicians for sending referrals to Medoc.

13.     From January 1, 2015 through August 31, 2016, the Medoc Defendants extracted approximately $2 million in kickbacks from Total RX, DSP, and Midcities under the guise of two sham employment agreements and one sham above-market value services agreement.

14.     In return, Defendants ensured that hundreds of federal prescriptions generated by the Medoc MSO physicians were referred to Total RX, DSP, and Midcities during the pendency of those agreements.

15.     During the Total RX sham employment agreement, Nguyen—though Total RX—knowingly submitted hundreds of kickback-tainted false claims to Medicare, Tricare, and the Department of Labor.  The United States paid Total RX approximately $3.5 million on the basis of those kickback-tainted false claims.

16.     In sum, the United States paid Total RX, DSP, and Midcities over $6 million on the basis of kickback-tainted false claims that were paid for by Medicare, Tricare, and programs operated by the Department of Labor.

## II.       JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1345, and supplemental jurisdiction over the common law and equitable causes of action under 28 U.S.C. § 1367(a).

18.     This Court may exercise personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. §§ 3732(a) & (b).  Jurisdiction is proper over each of the Defendants because acts committed in violation of the AKS and FCA by Defendants occurred in the Northern District of Texas, and because one or more of the Defendants can be found in, resides in, and/or transacts business in the Northern District of Texas.

19.     Venue is proper in the Northern District of Texas under 31 U.S.C. § 3732, 28 U.S.C. §§ 1391(b)-(c), and 28 U.S.C. § 1395 because Defendants reside in and/or transact business in the Northern District of Texas.

## III.       PARTIES

20.     Plaintiff United States brings this action on behalf of the United States Department of Health and Human Services (HHS), specifically the Centers for Medicare & Medicaid Services (CMS), which is the operating division of HHS charged with administering the Medicare Program, 42 U.S.C. §§ 1395 et seq. (Medicare); the United States Department of Defense (DOD), specifically the Defense Health Agency (DHA), which administers the Tricare program; and the Department of Labor (DOL), which administers healthcare compensation programs through the Office of Workers' Compensation Programs, including pursuant to the Federal Employees' Compensation Act and Black Lung Benefits Act.

21.     Relator Mark Adams is a resident of Massachusetts and an employee of Cambridge Therapeutic Technologies, LLC.  Cambridge supplied Medoc with pharmaceutical products.

22.     Defendant Medoc Health Services, LLC is a Texas limited liability company with its principal place of business in Dallas, Texas.  During the time period relevant to this lawsuit, Medoc was owned, in whole or in part, by Kevin Kuykendall, Mark Schneider, Michael Schneider, Trenton Moody, and Moky Cheung.  Medoc's registered agent is William W. Meier III, and its registered address is 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202.

23.     Defendant Kevin Kuykendall is a resident of the State of Texas.  Kevin Kuykendall was an owner and principal in Medoc, and he served as Medoc's Chief Executive Officer during the time period relevant to the lawsuit.  Kevin Kuykendall is married to Defendant Sabrina Kuykendall.

24.     Defendant Sabrina Kuykendall is a resident of the State of Texas.  Sabrina Kuykendall was Medoc's Vice President of Finance during the time period relevant to this lawsuit.  She is married to Defendant Kevin Kuykendall.

25.     Defendant Trenton Moody is a resident of the State of Texas.  Moody was an owner and founding principal of Medoc, and he served as a Partner in Medoc during the relevant time period.

26.     Defendant Mark Schneider is a resident of the State of Texas.  Mark Schneider was an owner and founding principal of Medoc, and he served as a Managing Partner in Medoc during the relevant time period.

27.     Defendant Michael Schneider is a resident of the State of Texas.  Michael Schneider was an owner and founding principal of Medoc, and he served as a Partner in Medoc during the relevant time period.  Defendants Mark and Michael Schneider are brothers.

28.     Defendant Moky Cheung is a resident of the State of Texas.  During the time period relevant to the lawsuit, Cheung was an owner and principal in Medoc.  Cheung also served as Medoc's Chief Information Officer during the relevant time period.

29.     Defendant Total RX Care, LLC f/k/a Total RX Care, Inc. was a pharmacy incorporated in the State of Texas, with its principal place of business in Rowlett, Texas.

30.     Defendant Cuong "Michael" Nguyen is a resident of the State of Texas.  During the time period relevant to the lawsuit, Nguyen was an owner of Total RX.  Nguyen also served as Total RX's President and Chief Executive Officer.

## IV.     THE FEDERAL HEALTHCARE PROGRAMS

### A.     The Medicare Program

31.     Congress established the Health Insurance for the Aged and Disabled Program, commonly referred to as Medicare, via Title XVIII of the Social Security Act of 1965.  The Secretary of HHS, acting through CMS, has overall responsibility for Medicare, and has broad authority to "prescribe such regulations as may be necessary" for its implementation.  42 U.S.C. § 1395hh(a)(1).

32.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426 & 426A.

33.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part D, also called the Medicare prescription drug benefit, is an optional program to help Medicare beneficiaries pay for self-administered prescription drugs through prescription drug insurance premiums.  The Medicare program is administered through CMS.

34.     Medicare Part D coverage is based on a private market model.  Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan "Sponsors," to administer prescription drug plans.

35.     Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. The Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.  Part D Sponsors, in turn, enter into subcontracts with pharmacies or other downstream entities to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

36.     Medicare Part D covers only drugs that are prescribed for a "medically accepted indication," which, in general, means a use that is (1) approved by the U.S. Food & Drug Administration (FDA) under the Food Drug and Cosmetic Act, or (2) supported by one or more citations in one of the following compendia: American Hospital Formulary Service Drug Information, United States Pharmacopeia-Drug Information (or its successor), or DRUGDEX Information System (collectively, the "compendia").  *See* 42 U.S.C. §§ 1395w-102(e)(1), (e)(4), 1396r-8(g)(1)(B), (k)(6); 42 C.F.R. § 423.100.

37.     When a pharmacy dispenses drugs to a Part D beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D Sponsor.  The pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the portion of the covered drug cost not paid by the Part D beneficiary at the point of sale.  Sometimes a pharmacy benefit manager, or PBM, serves as an intermediary between the Part D Sponsor and the pharmacy.

38.     The Part D Sponsor is required to submit to CMS an electronic notification of the drug dispensing event, called the Prescription Drug Event (PDE), which contains data regarding the Medicare prescription drug claim, including the drug dispensed, the quantity dispensed, whether the drug is a compound, the service provider that dispensed the drug, the prescriber, the patient, the amount paid to the pharmacy, the copayment amount, and whether the drug is covered under Medicare Part D.

39.     Certain information in the PDE is derived from the representations that the pharmacy makes when it submits the reimbursement claim to a Medicare Part D Sponsor. These representations include the drug dispensed, the quantity dispensed, whether the drug was a compound, the service provider that dispensed the drug, the prescriber, and the patient.

40.     Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the claim for payment for each individual prescription submitted to Medicare under the Part D program.

41.     Generating and submitting PDE claims data is necessary for CMS to administer the Part D program and make payments to Part D Plan Sponsors to reimburse them for qualified prescription drug coverage that they provide to Medicare beneficiaries. Generating and submitting PDE data is a condition of payment for CMS's provision of Medicare funds to Part D Plan Sponsors. *See* 42 C.F.R. § 423.322.

42.     The payments made by CMS to the Part D Sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.F.R. § 423.315(a).

43.     In order to receive Part D funds from CMS, the Part D Plan Sponsors—as well as their authorized agents, employees, and contractors (including pharmacies)—are required to comply with applicable federal laws, regulations, and CMS instructions. By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112. Further, CMS regulations expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA and AKS. *See* 42 C.F.R. § 423.505(h)(1).

44.     Accordingly, all contracts entered into between CMS and Part D Plan Sponsors from 2006 through the present include a provision in which the Sponsor "agrees to comply with . . . federal laws and regulations designed to prevent . . . fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the

False Claims Act (31 U.S.C. §§ 3729, *et seq*.), and the anti-kickback statute (§ 1127B(b)) of the Act)." *Id.*

45.     Further, CMS regulations also expressly require that all subcontracts between Part D Plan Sponsors and "downstream" or "related" entities require such entities to perform "any services or other activity" in a manner that "compl[ies] with the Part D Sponsor's contractual obligations," including the Part D Plan Sponsor's contractual obligation to comply with the AKS and FCA.  *See* 42 C.F.R. § 423.505(i)(4)(iv).  Moreover, these entities must also operate under contractual obligations to comply with all applicable federal laws, regulations, and CMS instructions. *See id.*

46.     CMS regulations further require Part D Plan Sponsors to certify to the accuracy, completeness, and truthfulness of the PDE claims data submitted to CMS. Specifically, the relevant regulatory provision, entitled "Certification of data that determine payment," obligates each Part D Plan Sponsor to certify that "the information CMS relies on in determining payment is accurate, complete and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k).  Compliance with the regulatory requirement that the PDE data submitted to CMS is "true, accurate, and complete" is a condition of payment under the Medicare Part D program.

47.     Since the Part D program began, CMS has required each Part D Plan Sponsor to sign annually an Attestation of Data Relating to CMS Payment to a Medicare Part D Sponsor, which includes a representation that the PDE claims data the Sponsor

submits to CMS is "accurate, complete, and truthful"; the Sponsor has required each

subcontractor generating PDE data "to certify that this information is accurate, complete,

and truthful based on its best knowledge, information, and belief"; and the Sponsor

acknowledges the claims data submitted to CMS "will be used for the purposes of

obtaining federal reimbursement and that misrepresentations or omissions in information

provided to CMS may result in Federal civil action and/or criminal prosecution."  All

approved Part D Plan Sponsors who received payment under Medicare Part D in benefit

years from 2006 through the present submitted these required attestations in the same or

similar format.

48.     With regard to pharmacies and other subcontractors participating in the

Medicare Part D program, CMS regulations further provide: "If the claims data are

generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the

entity, contractor, or subcontractor must similarly certify (based on best knowledge,

information, and belief) the accuracy, completeness, and truthfulness of the data and

acknowledge that the claims data will be used for the purposes of obtaining Federal

reimbursement." 42 C.F.R. § 423.505(k)(3).

49.     In order to submit claims for payment to Medicare Part D, Total RX, DSP,

and Midcities Pharmacy executed provider agreements which obligated them to comply

with all federal and state rules and regulations, including the FCA and AKS.

## B.      The Tricare Program

50.     TRICARE, formerly known as Civilian Health and Medical Program of the

Uniformed Services (CHAMPUS), is a Department of Defense program that helps pay

for covered civilian health care—including prescription drugs—obtained by certain

military beneficiaries, including retirees, their dependents, and dependents of active-duty

personnel.  10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199.  TRICARE contracts with fiscal

intermediaries and managed care contractors to review and pay claims, including claims

submitted by Total RX, DSP, and Midcities.  Since 2013, the TRICARE program has

been managed by DHA, the Defense Health Agency.

51.     TRICARE contracts with Express Scripts, Incorporated (ESI) to administer

the prescription drug coverage of the TRICARE program, including the processing and

payment of claims for reimbursement from TRICARE for compounded prescription

drugs.

52.     A pharmacy seeking reimbursement from TRICARE must comply with

TRICARE's anti-fraud and abuse provisions.  32 C.F.R. § 199.9(a)(4).  Fraud includes

commission and kickback arrangements.  *Id*. § 199.9(c)(12).

53.     To receive reimbursement from TRICARE for compounded drugs, a

pharmacy must enter into a Provider Agreement with ESI, TRICARE's pharmacy

benefits manager.  A Provider Agreement is essential to TRICARE claims submission.

Alternatively, a pharmacy may instead contract with a pharmacy services administrative

organization (PSAO) to contract with ESI on the pharmacy's behalf and provide other

services that assist the pharmacy in working with ESI.

54.     Total RX, DSP, and Midcities Pharmacy, on their own behalf or through

PSAOs, entered into Provider Agreements with ESI and used those agreements to obtain

reimbursement from TRICARE during the relevant time period of this lawsuit.

55.     For example, on December 10, 2014, Defendant Nguyen executed a

Pharmacy Provider Agreement with ESI on behalf of Defendant Total RX.  In that

agreement, Total RX agreed to "be bound by and comply with the provisions of this

Agreement and all applicable laws, rules and regulations including, but not limited to,

fraud, waste and abuse laws."  Likewise, ESI expressly reserved the right to reverse any

claim submitted by Total RX where Total RX "failed to . . . verify that the prescription

was issued in accordance with applicable laws, rules and regulations."

56.     TRICARE relied on the representations made by these pharmacies at the

time it paid their claims, and if TRICARE had known that representations in the

pharmacies' Provider Agreements were false, TRICARE would not have paid their

claims.

**C.      The Department of Labor—Office of Worker's Compensation Programs**

57.     The Federal Employees' Compensation Act, 5 U.S.C. §§ 8101, *et seq.*

(FECA) provides benefits to civilian employees of the United States for wage-loss

disability due to a traumatic injury or occupational disease sustained while working as a

federal employee (the FECA program).  The Office of Workers' Compensation Programs

(OWCP), a component of DOL, administers the FECA program.

58.     When a qualified employee suffers a work-related injury, the employee

files a claim for coverage with OWCP, which then assigns the claimant an OWCP

number.

59.     To obtain reimbursement for prescription drugs provided to OWCP

claimants (i.e. DOL beneficiaries), a pharmacy has to submit its prescription claims for

payment to OWCP using the beneficiary's OWCP claim number.  By submitting a claim

for reimbursement with OWCP, the pharmacy provider certifies that the service or

product for which reimbursement was sought was medically necessary, appropriate, and

properly billed in accordance with accepted industry standards.

60.     OWCP processes claims submitted by providers, and if all required

information is included, OWCP reimburses the provider.

61.     OWCP relies on representations made by pharmacies when it pays claims.

If OWCP had known that these representations were false, it would not have reimbursed

the claims.

## V.     THE LAW

### A.     The False Claims Act

62.     The FCA provides for the award of treble damages and civil penalties for,

*inter alia*, knowingly causing the submission of false or fraudulent claims for payment to

the United States government.  31 U.S.C. § 3729(a)(1).

63.     The FCA establishes liability to the United States for any individual or

entity that:  "knowingly presents, or causes to be presented, a false or fraudulent claim for

payment or approval," 31 U.S.C. § 3729(a)(1)(A); "knowingly makes, uses, or causes to

be made or used, as false record or statement material to a false or fraudulent claim," *id.* §

3729(a)(1)(B); or "conspires to commit a violation of subparagraph (A) [or] (B)," *id.*

§ 3729(a)(1)(C).

64.     To show that an individual or entity acted "knowingly" for purposes of the

FCA, the United States must establish that such individual or entity:  (1) has actual

knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or, (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. *Id.*

65.     While some FCA actions involve claims submitted to the Government that are false or fraudulent on their face, such as the submission of claims for services not rendered, the FCA's reach is not limited to these claims. "[A]ccurate claims submitted for services actually rendered may still be considered fraudulent and give rise to FCA liability if the services were rendered in violation of other laws." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013) (Costa, J.), aff'd sub nom. *United States ex rel. Parikh v. Brown*, 762 F.3d 461 (5th Cir. 2014), opinion withdrawn and superseded on reh'g and aff'd sub nom. *United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014).

66.     Claims for payment submitted to any federal healthcare programs in violation of the AKS are false claims for purposes of the FCA. *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901-02 (5th Cir. 1997); *see also United States ex rel. King v. Solvay, S.A.*, 823 F. Supp. 2d 472, 506 (S.D. Tex. 2011).

**B.      The Anti-Kickback Statute**

67.     The AKS prohibits any individual or entity from soliciting, receiving, offering, or paying any remuneration to induce or reward any person for referring, recommending, or arranging for the purchase of any item or service for which payment may be made under a "federal health care program." 42 U.S.C. § 1320a-7b(b).

68.     To protect the federal healthcare programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  The AKS makes it illegal for an individual or entity to knowingly and willfully:

> [O]ffer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in case or in kind to any person to induce such person—
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2).

69.     The AKS broadly prohibits "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. §§ 1320a-7(b)(1) & (b)(2).  As such, in addition to the more obvious types of remuneration prohibited under the AKS (e.g., cash, gifts, free vacations), the AKS also prohibits less direct forms of remuneration, such as providing cash payments under the guise of wages pursuant to sham employment agreements, or providing individuals an opportunity to participate in a joint venture or other entity, particularly under economic terms that make the investment extremely advantageous, devoid of risk, or under certain other circumstances where the potential referrer has a substantial financial interest in referring his or her patients to the subject venture or entity.

70.     Courts have consistently held that if "one purpose" of a transaction with a potential referring party is to induce referrals, the AKS has been violated.  *See United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-cv-3396, 2015 WL 5178074, at *13 (S.D. Tex. Sept. 3, 2015) ("The referral need not be the sole reason for the payment [to establish liability under the AKS.]"); *see also United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).  And as Defendants knew at all times relevant to the conduct discussed in this Complaint, claims submitted to federal government healthcare programs based on referrals procured in violation of the AKS constitute false claims for purposes of the FCA.

71.     This legal prohibition against using any kind of remuneration to induce patient referrals arose out of congressional concern that such kickbacks would result in goods or services being provided due to the economic self-interest of the parties, rather than based on an unbiased assessment of the patient's medical needs.  As the HHS, Office of Inspector General (HHS-OIG) has explained, the AKS "seeks to ensure that referrals will be based on sound medical judgment and that health care professionals will compete for business based on quality and convenience, instead of paying for referrals." OIG Advisory Opinion No. 12-06, OIG at p. 7 (May 25, 2012), *available at* http://oig.hhs.gov/fraud/docs/advisoryopinions/2012/AdvOpn12-06.pdf; *see also* OIG Advisory Opinion No. 98-16, OIG (Nov. 3, 1998), *available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/1998/ao98_16.htm ("One purpose of the

anti-kickback statute is to protect patients from inappropriate medical referrals by providers who may be unduly influenced by financial incentives.  The statute seeks to ensure that referrals will be based on sound medical judgment and that providers will compete for business based on quality and convenience, instead of paying for it.").

72.     To protect the federal fisc from this threat, Congress enacted, and continues to strengthen, the AKS's prohibition against paying kickbacks.  After the statute's initial adoption in 1972, *see* Social Security Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329, 1419-20 (1972), Congress amended the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate business transactions did not evade its reach.  *See* Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 100 Stat. 680 (1987).

73.     More recently, in the Patient Protection and Affordable Care Act of 2010 (ACA), Congress amended the AKS to further clarify that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  *See* Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 759 (2010), codified at 42 U.S.C. § 1320a-7b(g).

74.     In the ACA, Congress intended to codify the pre-existing legal consensus "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil action under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves."  155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010); *see also United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008)

(holding that under the pre-ACA AKS, all claims resulting from illicit kickbacks constituted false claims under the FCA); *see also United States ex rel. Capshaw v. White*, No. 3:12-CV-4457, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018) (Godbey, J.).

75.     A claim for reimbursement from a federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA.  42 U.S.C. § 1320a-7b(g).  Under this provision, claims submitted to federal health care programs that result from violations of the AKS are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a)(1)(A)-(B).  Accordingly, a person violates the FCA when he or she knowingly submits or causes to be submitted claims to federal health care programs that result from violations of the AKS.

76.     Specific intent is not required to establish a violation of the AKS.  *See* 42 U.S.C. § 1320a-7b(h) ("With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.").

77.     As set forth in more detail below, Defendants knowingly and willfully solicited, received, or paid kickbacks in exchange for arranging referrals of patients in federal healthcare program to pharmacies.  The Medoc Defendants implemented remuneration agreements with three different pharmacies, and one purpose of the remuneration paid by the pharmacies was to induce and/or reward the Medoc Defendants for the arrangement of federal referrals from physicians to the pharmacies.  The Total RX Defendants paid kickbacks to the Medoc Defendants to reward them for arranging federal referrals to Total RX.

78.     By arranging referrals of federal healthcare program patients to pharmacies that paid them kickbacks, the Medoc Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to federal healthcare programs, including Medicare, Tricare, and programs administered and funded by DOL.  Likewise, by agreeing to pay kickbacks for the arrangement of referrals of federal program patients, the Total RX Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to federal healthcare programs.

## VI.     THE MEDOC BUSINESS MODEL

79.     Defendants Kevin Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky Cheung are not doctors.  They founded Defendant Medoc Health Services, LLC in or around October 2014.

80.     Medoc purports to provide management, administrative, and marketing services to compounding pharmacies and other types of ancillary service providers, such as clinical laboratories.  Medoc's objective was to generate referrals to pharmacies for pain creams, metabolic supplements, and other products with high reimbursement rates— as high as tens of thousands of dollars for some products.  In return, Medoc received commissions or service fees from the pharmacies and ancillary service providers that processed their referrals.

A.     **The Medoc Defendants created MSOs composed of physician investors.**

81.     Medoc's core business involved organizing subsidiary entities, or MSOs, and then contracting with those entities to provide certain administrative, marketing, and management services in return for a percentage-based "service fee."

82.     The Medoc Defendants created over twenty of these subsidiary MSOs.

83.     Medoc co-owned the MSOs along with physicians willing and able to refer their patient prescriptions to Medoc for routing and fulfillment by Medoc-associated pharmacies.

84.     In return, Medoc paid physician-investors for referring their patients to Medoc by setting up contracts with the MSOs whereby the MSOs would purportedly assist Medoc in performing the management, administrative, and marketing services it had initially agreed to provide to the pharmacies.  Through this structure, Medoc paid MSO physicians who generated referrals for Medoc's contracted pharmacies.

85.     The Medoc Defendants paid the physician-investors in each of the MSOs money in return for those physician investors directing their patient prescriptions—both those paid for by private insurance companies and those paid for by the federal government—to the Medoc Defendants.

86.     Through their control of the MSOs and their payments to physician-investors for prescriptions, the Medoc Defendants exercised control over the prescriptions of the MSO physicians.  In particular, the Medoc Defendants controlled where the prescriptions generated by the MSO physicians were sent for fulfillment—and,

as a result, the pharmacies that were paid by both private insurers and the federal government for fulfilling the prescriptions written by Medoc MSO physicians.

87.     The Medoc Defendants leveraged their control of these prescriptions to extract "commissions"—really, kickbacks—from pharmacies.

88.     The payments to the MSO physician-investors also permitted the Medoc Defendants to impact the prescribing patterns of the physicians, as the physicians were urged to prescribe the drugs for which the Medoc Defendants received the highest payments—payments they passed along, in part, to the physicians.

**B.     The Medoc Defendants paid physicians for prescriptions.**

89.     Though the physicians held ownership interests in their respective MSOs, the Medoc Defendants retained and exercised complete control over the management of each MSO including, in particular, the referral of prescriptions to specific pharmacies for fulfillment.

90.     Medoc sold Class A membership interests—i.e., the units without management authority—to "Suitable Investors," namely physicians who met certain requirements, including that they were not "excluded or suspended from participation in Medicare, Medicaid or any other federal or state health care program."

91.     Each MSO's revenues derived from its physician-investors' referrals to Medoc.  In return—but under the guise of the MSO's purported provision of management, administrative, and marketing services to or on behalf of Medoc—Medoc

agreed to pay each MSO a portion of the revenue derived from the physician-investors' non-governmental referrals.[1]

92.     Medoc kept membership in each MSO low, to more directly tie payments to referrals despite the conceit of paying fees on the basis of ownership interest alone. Each Medoc MSO typically included between five and eight physician-investors.

93.     By setting up these subsidiary MSOs and selling the membership interests to physicians, the Medoc Defendants created a network of physicians that they could and did pressure for referrals payable by Medicare and other federal healthcare programs. And while the Medoc Defendants purportedly paid only for non-governmental referrals, they nonetheless pressured physicians to send their federal referrals to Medoc for fulfillment as well.

94.     In reality, the subsidiary MSOs did not provide any management, administrative, or marketing services to Medoc that would justify Medoc's payments to the physician-investors.  The MSOs did not even have their own office space—Medoc just listed its own corporate address for each MSO, with a Medoc executive as the point of contact.  For example, Medoc and the Wain MSO shared the same address and fax number.  And while Kevin Kuykendall was listed as the point of contact for Medoc, fellow Defendant and Medoc-founder Mark Schneider was listed as the point of contact

---

[1] For example, Medoc agreed to pay the Wain MSO physician-investors "service fees" in the amount of thirty-five percent of "all revenues collected by the Ancillary Businesses from private pay patients and non-governmental, private payors for ancillary healthcare services and/or products ordered by or on behalf of any Recruited Physician."  These service fees were generated by referrals from the Wain MSO physician-investors and then distributed back to the physicians in proportion to their ownership interest in the MSO.

for the Wain MSO.  And that is because the MSOs were not service providers—they were not real, independent entities at all.  They were just a mechanism for Medoc to track the doctors' referrals and pay them kickbacks.

95.     Because physicians were paid based on their ownership interest, rather than directly based on referrals, Medoc needed to be creative to reward and incentivize their high referring physicians—while punishing low referrers.  In addition to keeping MSOs small to more directly tie referrals to payments, the Medoc Defendants switched physicians from MSO to MSO based on the number of referrals that the individual physician sent to Medoc.  Medoc rewarded high prescribers by placing them in the higher referring MSOs—the "major leagues"—so they would receive higher payments for their referrals.  Medoc punished low prescribers by either kicking them out of the MSO system entirely or by relegating them to the "minors," that is, one of the lower volume MSOs, thereby reducing their monthly payments.  This allowed Medoc to influence and exert pressure and control over the MSO physicians' prescribing.

96.     On May 5, 2015, Kevin Kuykendall emailed MSO managers about two of the MSO physicians' low volumes: "We're allowing Dr Eric Eidsen to stay in Ayian . . . for the time being until we establish another MSO.  He's a great guy but not a huge scripter at this point.  However, he could be, if mentored.  As for the 2nd doctor, Medoc will be buying back his shares next week."  One of the MSO managers responded regarding Dr. Eidsen's fate: "I think the minor Mso is best way."

97.     To further drive physician-investors to refer, Medoc set up a physician portal where each MSO physician-investor could see prescriptions written by other

doctors within their MSO.  That allowed MSO physician-investors to exert pressure on physicians within their MSO, as one physician's poor performance would impact the payments to all of the physicians.

98.     Medoc prepared monthly distribution reports for each of its MSOs.  These reports emphasized to the doctors that their distribution payments derived from the doctors' referrals (and also identified the low performers).  Using the Wain MSO as an example, the September 2015 distribution report shows the number of prescriptions attributable to each physician:

| Doctor | | # of Scripts |
|---|---|---|
| Gibson, Scott | full month (5%) | 335 |
| Iagulli, Nicholas | full month (5%) | 857 |
| Kjeldgaard, Larry | full month (5%) | 166 |
| Mobarak, Reza | full month (5%) | 211 |
| Simonak, David | full month (5%) | 124 |
| Simonak, Ryan | full month (5%) | 41 |
| Stephens, Chad | full month (5%) | 186 |
| Westbrook, Rick | full month (5%) | 138 |
| Wain Total | | 2058 |

99.     According to that same distribution report, Medoc paid each of the eight physicians in the Wain MSO over $75,000 for referrals, as shown in the excerpts below:

| Wain Investor Distributions - September | |
|---|---|
| Gibson, Scott | $ 75,624 |
| Iagulli, Nicholas | $ 75,624 |
| Kjeldgaard, Larry | $ 75,624 |
| Mobarak, Reza | $ 75,624 |
| Noble Pain Mgmt | $ 75,624 |
| Simonak, David | $ 75,624 |
| Simonak, Ryan | $ 75,624 |
| Westbrook, Rick | $ 75,624 |
| Total Wain | $ 604,996 |

100.    The Medoc Defendants monitored the volume of the MSO physicians' referrals and pressured the physicians for higher production—that is, more referrals to Medoc.  MSO physician Dr. Jeffrey Ratusznik worked at Lone Star Orthopedic and Spine Specialists with four other MSO physicians.  On August 19, 2016, Lone Star's practice administrator emailed the physicians: "Just want to give you a heads up that Medoc is planning on coming this Monday after clinic for the monthly Medoc meeting.  They seem to be a little concerned about our low July & August numbers.  They would like to discuss the blood draws again and a few other updates."

**C.     The Medoc Defendants controlled the prescription fulfillment process for MSO physicians and their patients.**

101.    Medoc operated a call center, known as Pharmlogix or Millton, that facilitated its schemes.  In addition to arranging referrals to pharmacies, Medoc made changes to prescriptions at the call center to increase Medoc's reimbursement.  Medoc called this process "Therapeutic Interchange."

102.    As part of the "TI process," call center employees would white-out or edit prescriptions from physicians.  On May 23, 2017, for example, one of the call center staff, Natalie Mounts, sent out a "**REVISED** 'white-out/edit' of a TI" to the call center technicians and pharmacists.  The email instructed: "You will 'white-out/delete' the text marked in **RED**.  The text in **BLUE**, Laura will white out when she scans them into Docu-sign."

103.    When PBMs audit pharmacies in an effort to detect waste, fraud, or abuse, PBMs may request original prescriptions to compare against the dispensed product.

When PBMs audited interchanged prescriptions, Medoc prepared fraudulent prescriptions for the pharmacies to submit in response to the audit.

104.    Medoc used DocuSign to obtain signatures from physicians for audited prescriptions.  In addition to the white-out process, Medoc's employees added false fax stamps to the prescriptions to pass the audits.  Medoc did this so that PBMs would not claw back the reimbursement for those prescriptions during audits.

105.    Defendant Moky Cheung kept electronic images of MSO physician signatures on his computer.  In addition to the DocuSign practice, Cheung copied and pasted images of physician signatures onto prescriptions to pass audits.

106.    Medoc prepared pre-printed prescription pads with their preferred "scripts" (prescriptions) for their MSO doctors.  These script pads listed topical creams and other products with high reimbursements rates, and the physician-investors were urged to write prescriptions for their federal and non-federal patients based on these script pads—i.e., based on what paid the most—rather than simply on the patients' needs.

107.    To maximize revenue, Medoc changed the script pads regularly based on the reimbursement amounts for various drug combinations, which in turn resulted in larger payments to the doctors (and the Medoc Defendants).

108.    One physician in the Howell MSO—Dr. Gary Lawton—regularly checked every box on Medoc's script pad.  This practice increased the Howell MSO's revenue, which in turn increased Dr. Lawton's own monthly distribution payments.

109.    For example, in August 2016 Medoc began adding Doxepin to prescriptions when one PBM stopped paying for Lidocaine 5% ointment.  On August 16,

2016, Felisha Payne, a Medoc purchasing director who is neither a doctor nor a

pharmacist, emailed Tina Doan, Eric Nelsen (Medoc's Vice President of Pharmacy

Operations), Kevin Kuykendall, and Jim Campbell about Lidocaine being "turned off": "I

suggest moving to Doxepin 5% cream as a replacement and as a backup in case the other

PBMs follow suit.  Its average profit is $841."

110.    On August 29, 2016, Tina Doan—Medoc's Chief Compliance Officer—

emailed Kevin Kuykendall and Jim Campbell about meeting with the pharmacists.  She

reported: "HAD MEETING AND CLEARED WITH RPHS [registered pharmacists] –

STARTING TODAY, ADD ON DOXEPIN TO ALL PAIN THERAPY INSTEAD OF

DICLOFENAC."

111.    Kevin Kuykendall responded to Tina Doan's email about adding on

Doxepin: "Great job.  I appreciate you jumping on this and making it happen."  Doan

replied: "No problems, you will see results and I will keep you inform [*sic*] all the way."

112.    At the urging of the Medoc Defendants, MSO physicians began prescribing

Doxepin to their patients.  As a result, in November 2016, one of Medoc's commercial

pharmacies was audited by Caremark due to a spike in Doxepin prescriptions.  Doan

directed Payne (the purchasing director) to prepare an invoice and submit it to Caremark

in response to the audit.  Payne refused, so it was done by Nelsen instead.  Nelsen then

emailed Moky Cheung and Sabrina Kuykendall an update: "Felisha said she is not

comfortable forging documents and I am not sure how to tell her she should.  Of course

Tina being the person asking doesn't help as Tina's interpersonal skills are suspect at

best.  I will talk to Felisha tomorrow about how we need to suck it up and get things done

and if she is uncomfortable with something to bring it to me."  Sabrina Kuykendall

forwarded the email exchange to Kevin Kuykendall and Jim Campbell, noting that Payne

was not asked "to produce unrealistic documents."

113.    Medoc also denied the MSO physicians and their patients the ability to

choose where to fill their prescriptions.  Instead, Medoc retained control over the referrals

and prevented the patients from choosing their usual pharmacy.  By limiting the patients'

choice, Medoc was in a position to extract commissions from pharmacies in exchange for

arranging referrals.

114.    The Medoc Defendants' control over the pharmacy chosen to fulfill MSO

physician prescriptions was so extensive that they could—and did—change the pharmacy

charged with fulfilling a federal program patient prescription from month to month based

on the kickback schemes they were operating.

115.    For example, B.C. was a DOL beneficiary and a patient of MSO physician

Dr. Nicholas Iagulli.  Between April 21, 2015 and July 14, 2015 (during the pendency of

the Total RX sham employment agreement, discussed below), the Medoc Defendants

directed B.C.'s prescriptions to Total RX for fulfillment.  Total RX submitted claims for

payment to DOL on the basis of B.C.'s prescriptions during this time period.  DOL paid

Total RX $74,633.22 for those claims.  After the Vintage Grow Agreement was executed

in mid-August of 2015, the Medoc Defendants simply changed the pharmacy charged

with fulfilling B.C.'s prescriptions from Total RX to DSP.  From August 2015 until

December 28, 2015, the Medoc Defendants directed B.C.'s prescriptions to DSP for

fulfillment.  DSP submitted claims for payment to DOL on the basis of B.C.'s

prescriptions during this time period.  DOL paid DSP $90,566.24 for those claims.

116.    B.C. normally filled prescriptions at CVS or Walgreens.  But the Medoc

Defendants, not the patients, controlled the pharmacies charged with fulfilling MSO

prescriptions.  B.C.'s pain and scar creams were fulfilled and mailed by the pharmacies

of Medoc's choosing.

117.    In addition to paying the MSO physicians, Medoc solicited and received

commissions or sales fees from pharmacies for arranging the referral of Medoc MSO

physician-generated prescriptions to those pharmacies.

118.    If pharmacies did not pay commissions to Medoc, Medoc stopped routing

prescriptions to those pharmacies.  For example, on November 16, 2015, Kevin

Kuykendall emailed Sabrina Kuykendall about commissions purportedly owed by

Westpoint Pharmacy: "They owe Medoc $400k today and don't have the funds" and,

accordingly, "nothing else goes to WestPoint until we figure this out."

119.    By arranging for commission payments from pharmacies based on the

referrals generated by MSO physicians, the Medoc Defendants took a cut of the revenue

generated from the MSO physicians' referrals.

**D.    The Medoc Defendants knew that the AKS and FCA prohibited paying
        kickbacks for arranging the referral of federal program patient prescriptions.**

120.    Before Medoc, Defendants Kevin Kuykendall, Sabrina Kuykendall, Mark

Schneider, Michael Schneider, and Moky Cheung had been involved with a company

called Vita-Spire.  Vita-Spire set up commission agreements with independent contractor

marketers.  These commission agreements referenced the AKS and stated in bold italic font: "*Any Prescriber who is caught obtaining a commission for his/her prescriptions will be prosecuted to the fullest extent of the law and all commissions will be required to be repaid to the Company.*"

121.    In May 2015, Kevin Kuykendall spoke with a prospective MSO investor's healthcare attorney about Medoc's MSO model.  On May 27, 2015, the prospect's attorney sent an email to Michael Schneider about the phone call: "From a regulatory standpoint, I guess the overreaching question is how do we reconcile Medoc's assertion that the arrangement is 'all legal' at the same time admitting that it does not meet a safe harbor and the sole purpose of the services is remuneration in return for referrals.  My hope is that this was just a misstatement or misunderstanding."

122.    Defendants Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Michael Schneider, and Moky Cheung all knew that the AKS prohibited soliciting or receiving payment in exchange for arranging referrals for which payment may be made in whole or in part by federal healthcare programs.  For that reason, Medoc's contracts with pharmacies limited Medoc's commissions to private-pay referrals (i.e. non-government prescriptions).

**E.    The Medoc Defendants leveraged their control over MSO physician prescriptions to extract kickbacks from pharmacies.**

123.    Through the MSOs, the Medoc Defendants were in a position to arrange significant volumes of federal referrals, not just private-pay referrals.  And, as with the

"service" or "commission" fees they extracted from the pharmacies where they sent non-governmental referrals, they wanted a piece of the revenue.

124.    But given their knowledge of the AKS and FCA, the Medoc Defendants also knew that simply adding federal government payors to any of their private-pay agreements would violate the AKS.

125.    So instead, the Medoc Defendants set up side agreements with three different pharmacies: Total RX; Doctors Specialty Pharmacy; and Midcities Pharmacy. The purpose of each of these side agreements was to induce and/or reward the Medoc Defendants for arranging the referral of federal program patient prescriptions generated by MSO physicians to the these pharmacies.

## VII.    THE FRAUDULENT SCHEMES

### A.    The Total RX Sham Employment Agreement (January 2015 through August 2015)

126.    Defendant Total RX Care, LLC f/k/a Total RX Care, Inc. was a pharmacy founded in 2014 by Defendant Michael Nguyen, a licensed pharmacist.  Nguyen initially founded Total RX to provide infusion and related pharmaceutical services to patients in and around Rowlett, Texas.

127.    Through its contracts with PBMs such as ESI and the AccessHealth PSAO, Total RX was able to submit claims for payment to federal healthcare programs such as Medicare Part D, Tricare, and programs administered by DOL.

128.    Business was slow for the first several months after Total RX opened. Nguyen struggled to find physicians who would refer infusion services to Total RX.  By

December 2014, Total RX was running low on funds and revenue could not cover the pharmacy's costs, forcing Nguyen to use his own money to keep the pharmacy afloat.

### 1.    The Total RX Testing Phase

129.    In December 2014, Nguyen was introduced to Mark Schneider.  Schneider told Nguyen that he could market Total RX to physicians and increase referrals to Total RX.

130.    Nguyen met with Mark Schneider and Kevin Kuykendall in December 2014.  They told Nguyen that they had developed relationships with physicians and could generate substantial referrals to Total RX.

131.    By January 2015, Nguyen and Total RX were interested in partnering with the Medoc Defendants and keeping their struggling pharmacy alive.  But Kuykendall and Mark Schneider wanted to make sure that Total RX could handle the volume of referrals that they could send to the pharmacy.  They proposed a testing phase, during which the Medoc Defendants would arrange referrals to Total RX in return for half the net profits minus cost of goods sold (COGS) from those referrals.  Nguyen and Total RX agreed.

132.    Physician referrals immediately started pouring into the pharmacy.  But they were not for infusion services.  Instead, the majority of the referrals were for compound prescriptions, such as pain creams.  These referrals—for both private pay and federal healthcare program patients—came from the Medoc Defendants through their control of the prescriptions generated by the MSO physicians.

133.    As a result of these Medoc MSO referrals, Total RX and Nguyen started making significantly more money.

134.    After several weeks of "testing," Defendant Kevin Kuykendall told Nguyen and Total RX that they could do business together.  In February 2015, Total RX formally executed an agreement with Defendant Medoc for "sales representation."  The agreement was effective as of January 1, 2015.

135.    Per the agreement, Medoc would provide marketing services to Total RX. In return, Total RX agreed to pay Medoc "50% of adjudicated amount less cost of goods" from any "third-party private insurance Payor."  The agreement explicitly excluded any items or services paid for by a federal healthcare program.

136.    Total RX continued to process the compounding prescriptions that came into the pharmacy from Medoc.  These compounding prescriptions soon represented almost all of Total RX's business.  And Total RX paid Medoc commissions on the private pay referrals.  But it did not pay commissions on federal referrals, yet.

**2.    The Medoc Defendants demand that Total RX hire Defendant Michael Schneider and pay him kickbacks for federal referrals.**

137.    By March 2015, Nguyen and Total RX were already paying the Medoc Defendants large kickbacks on all private insurance referrals—but not on the federal referrals.  Despite knowing that the AKS prohibited paying, soliciting, or receiving remuneration on federal referrals, the Medoc Defendants also wanted a cut of the federal revenue they were generating for Nguyen and Total RX.

138.    In or around March 2015, Kevin Kuykendall suggested to Nguyen and Total RX that they add Michael Schneider—one of Medoc's founding partners—to Total RX's employee payroll.  As Nguyen and Total RX understood, the Medoc Defendants

now wanted Total RX to pay for the federal referrals that the Medoc Defendants were

sending to Total RX for fulfillment.  But the Medoc Defendants and the Total RX

Defendants knew they could not include federal referrals in the pre-existing agreement

between Medoc and Total RX.  So, Kevin Kuykendall instead suggested to Nguyen that

he make Schneider a W2 employee of Total RX.

139.    On March 6, 2015, Kevin Kuykendall sent Nguyen and Mark Schneider a

draft employee at will (EAW) agreement.  The agreement provided that the EAW

(Michael Schneider) would receive an annual salary of $30,000 and forty percent of gross

adjudications less COGS.  Kevin Kuykendall wrote: "This is the Agreement we should

have the sales reps sign."

140.    But Nguyen and Total RX did not immediately add Michael Schneider to

Total RX's payroll.  The Total RX Defendants had been receiving federal referrals

without having to pay commissions for almost two months.

141.    The Medoc Defendants persisted.  On March 31, 2015, Michael Schneider

sent a signed employment agreement to Nguyen via email.  Schneider included Moky

Cheung and Kevin Kuykendall on his email.

142.    In this new agreement, Michael Schneider would receive: (i) an annual

salary of $30,000 per year, paid twice a month; and (ii) 45% commissions on payments

derived exclusively from federal healthcare programs, as shown below:

Commissions payable to Employee shall be calculated on Net Adjudications (Gross Adjudication less Cost of Goods) per month from all Medicare, Medicaid, and Tricare.  Company will pay Employee forty five percent (45%) of Net Adjudications on the 15th of every month for the previous month's sales.

143.    The March 31 Agreement was backdated to be effective as of January 1, 2015.  Schneider also sent Nguyen and Total RX a backdated tax document—a Form W-4 Employee's Withholding Allowance Certificate.

144.    The next day, April 1, 2015, Kevin Kuykendall emailed Moky Cheung, Mark Schneider, and Sabrina Kuykendall asking why a report showed a decrease in Medoc's commissions from Total RX—i.e., the payments Nguyen and Total RX sent to the Medoc Defendants on the basis of payments related to private, non-government referrals.  Cheung stated that he had removed the "federal people," resulting in the decrease; to which Kuykendall responded: "So those are the Tricare reimbursements that will be paid to the Employee at Will.  Is that correct?" as shown below:

## RE: Why did Medoc's commissions go down by $139,000 over the past 6 hours?

| | |
|---|---|
| **From:** | Kevin Kuykendall <kevink@medoc-llc.com> |
| **To:** | Moky Cheung <mcheung@vita-spire.com> |
| **Cc:** | Mark Schneider <mark.schneider@vita-spire.com>, Sabrina Kuykendall <sabrina.kuykendall@vita-spire.com> |
| **Date:** | Wed, 01 Apr 2015 22:00:04 -0500 |

So those are the Tricare reimbursements that will be paid to the Employee at Will.  Is that correct?

145.    Cheung replied "Affirmative" to everyone on the email.  The next day, Kuykendall forwarded the email chain to Michael Schneider.

146.    Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Michael Schneider, and Cheung all understood and agreed that the purpose of this scheme was to

solicit and receive kickbacks from Total RX for the arrangement of federal referrals from the MSO physicians to Total RX—and then divide those kickbacks amongst themselves.

147.    On April 2, 2015, Moky Cheung emailed Kevin Kuykendall, Mark Schneider, and Nguyen to set up a conference call.  Cheung stated that the purpose of the call was to answer questions Nguyen had about hiring Michael Schneider as a W2 employee.

148.    Nguyen had not signed the EAW agreement with the explicit reference to Medicare, Medicaid, and Tricare.  On that April 2, 2015 conference call, Kevin Kuykendall, Mark Schneider, Moky Cheung and Nguyen discussed the Medoc Defendants' demand that Nguyen and Total RX hire Michael Schneider as a W2 employee.

149.    On or around April 6, 2015, Moky Cheung sent a revised employment agreement to Nguyen through DocuSign.  The new agreement had several changes from the March 31 Agreement, including:

- The agreement was backdated to March 1, 2015, instead of January 1, 2015.

- The agreement removed the explicit reference to federal payment programs.  Instead, the commission terms were revised to reference a tracking mechanism in Total RX's system, which was an unstated stand-in for federal healthcare program referrals.  And the 45% commission structure for those federal referrals remained in the agreement.

- The $30,000 annual salary was referred to as a monthly draw.

150.    During the April 2, 2015 call, as illustrated in the April 6, 2015 revised employment agreement and their subsequent work together, the Medoc Defendants and the Total RX Defendants agreed to work together to route kickbacks on federal referrals

from Total RX to the Medoc Defendants under the guise of "wages" to Michael

Schneider.  Each of the Defendants agreed to work together to mask these illicit

kickbacks, which they each knew would violate the AKS and result in the submission of

false claims to the United States in violation of the FCA.

151.    On April 6, 2015, Nguyen (on behalf of Total RX) and Michael Schneider

executed the employment agreement.  All of the Defendants understood that the

agreement was a sham designed to pay the Medoc Defendants kickbacks in return for

arranging federal referrals to Total RX.  Each of the Defendants also understood that the

agreement would serve to recompense the Medoc Defendants for the federal referrals

they had sent to Nguyen and Total RX stretching back to January 2015.

152.    Shortly after executing the agreement, Nguyen added Michael Schneider to

Total RX's payroll service provider, Paychex.

153.    Michael Schneider did not perform services for Total RX.  He did not

actually report to Michael Nguyen.  Michael Schneider's sole role as an "employee" of

Total RX was to get his "salary" and divide it up amongst his fellow Medoc partners.

154.    As part of the agreement and scheme, Sabrina Kuykendall and Moky

Cheung were responsible for calculating the kickback on federal referrals to be paid by

Total RX to Michael Schneider.

155.    On April 17, 2015, Total RX paid Michael Schneider his first

"commission" under the employment agreement.  The agreement had been signed only

eleven days earlier, on April 6, 2015.  Despite that, Nguyen and Total RX paid Michael

Schneider a hefty "commission" based on the federal referrals that the Medoc Defendants had directed to Total RX from January 30, 2015 through the end of March 2015.

156.    The Medoc Defendants kept at least one spreadsheet (the Total RX EAW spreadsheet) that included tabs tracking the kickbacks owed to Michael Schneider on the basis of his employment agreement with Total RX.  The spreadsheet included a tab for March 2015—the month prior to the execution of the employment agreement—and for April 2015.

157.    Michael Schneider did not keep or update the spreadsheet—or otherwise participate in the calculation or payment of his own "salary."  Instead, Defendants Kevin Kuykendall, Sabrina Kuykendall, Moky Cheung, and Michael Nguyen worked together to calculate the kickbacks that the Total RX Defendants would pay to Michael Schneider under the employment agreement.

158.    In particular, the Total RX Defendants were responsible for collecting information on the federal referrals that the Medoc Defendants had sent to Total RX during a given month, and providing that data to the Medoc Defendants.  Then the Medoc Defendants—specifically, Kevin Kuykendall, Sabrina Kuykendall, and Moky Chueng—would review the data and calculate the kickback owed to the Medoc Defendants.

>   **a.    The Medoc Defendants' federal referrals to Total RX from January through March 2015 result in an April kickback payment.**

159.    The Total RX EAW spreadsheet includes a tab labeled "Michael Schneider March," which lists federal referrals from MSO physicians and the resulting reimbursements from federal healthcare programs.  The spreadsheet includes federal

referrals from MSO physicians to Total RX from January 30, 2015 through the end of March 2015—i.e., before the already backdated March 1, 2015 employment agreement. The March tab of the spreadsheet only includes referrals occurring before Michael Schneider executed his employment agreement with Total RX in April 2015.

160.    On the basis of the federal program patient prescriptions referred to Total RX by the Medoc Defendants from January 30, 2015 through March 31, 2015, the spreadsheet calculates total "commissions" to Michael Schneider, as shown below.  After Social Security and Medicare taxes, the amount calculated was $213,554.26:

| | |
|---|---|
| TOTAL INS | $609,226.94 |
| TOT COGS | $111,112.60 |
| TOT COMM | $224,151.45 |
| 118500 | $  (7,347.00) |
| | $  (3,250.20) |
| After ssn/mc | $213,554.26 |

161.    On or around April 17, 2015, Total RX paid Michael Schneider $213,554.26.  The Total RX EAW spreadsheet shows that the payment to Michael Schneider was based on the federal referrals that the Medoc Defendants directed to Total RX prior to the commencement of Schneider's alleged employment with Total RX.

162.    After receiving his "wages" from the Total RX Defendants on the basis of the January through March federal referrals, Schneider shared his "wages" with the other Medoc Defendants by depositing a portion of the $213,554.26 kickback into a bank account for a new pass through entity—Barolo Partners, LLC.

163.    On April 27, 2015, an entity called Barolo Partners, LLC registered with the Texas Secretary of State.

164.    Barolo Partners' manager was Kevin Kuykendall.  The four individuals who owned Barolo also owned Medoc in conjunction with Michael Schneider.  Barolo's ownership was divided among four entities, each of which was owned by Medoc's principals: (1) K & S Biotherapeutics, LLC (owned by Kevin & Sabrina Kuykendall); (2) MCS Interests, LP (Mark Schneider); (3) Performance Biomedical, LLC (Trenton Moody); and (4) Radix Resources, LLC (Moky Cheung).

165.    Michael Schneider's entity was Shemiyah Holdings, LP.

166.    On or around April 29, 2015, Barolo Partners set up its own bank account at Chase Bank.  Medoc transferred $1,000 into the Barolo bank account to open it.

167.    Sabrina Kuykendall kept a document showing payments made by the Total RX Defendants to the purported employee at will, Michael Schneider.  In addition, Sabrina's spreadsheet identified how the Total RX kickback payments were divided up among the Medoc Defendants through their respective holding companies.

168.    According to Sabrina Kuykendall's spreadsheet, the April 17 kickback payment was distributed among the Medoc partners as follows:

**Barolo Account Activity**

| Date | Gross Check Amount | | K&S | MCS | Perf. Biomed. | Radix | Shemiyah |
|------|------|---|-----|-----|---------------|-------|----------|
| Incoming 4/17/15 | $ | 213,554.26 | 56,378.32 | 56,378.32 | 42,710.85 | 1,708.43 | 56,378.32 |

169.    In sum, the Medoc Defendants solicited and received $213,554.26 in kickbacks from the Total RX Defendants through a sham employment agreement

executed in April 2015 for federal referrals that the Medoc Defendants directed from MSO physicians to Total RX from January 30, 2015 through March 2015.

170.   The $213,554.26 payment was an inducement and reward paid by the Total RX Defendants to Defendants Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Michael Schneider, Trenton Moody, and Moky Cheung in return for arranging for the referral of federal healthcare program patients to Total RX from January 2015 through March 2015.  These individuals had all agreed to split the kickback payments from Total RX for the arrangement of federal referrals from Medoc MSO physicians to Total RX.

171.   From January 30, 2015 through March 31, 2015, the Medoc Defendants arranged for over 100 federal healthcare program patient prescriptions to be referred from MSO physicians to Total RX for fulfillment.  Each of these claims was false because it was tainted by the kickbacks that the Medoc Defendants solicited and received from the Total RX Defendants through the sham employment agreement with Michael Schneider. Those kickbacks were meant to and did reward and induce the federal program patient referrals.  Most, if not all, of these prescriptions are included in the Total RX EAW spreadsheet, which tracked and identified federal referrals arranged by the Medoc Defendants to Total RX.  Examples of federal program patient prescriptions referred by the Medoc Defendants to Total RX during this time period include the following:

- On or around January 30, 2015, Medoc MSO physician Dr. Raymond Westbrook wrote a prescription for patient D.W., a Tricare beneficiary. Total RX submitted a claim for payment to Tricare on the basis of D.W.'s prescription.  Tricare paid $6,014.76 to Total RX on the claim.

- On or around February 11, 2015, Medoc MSO physician Dr. Reza Mobarak wrote two prescriptions for patient T.C., a Tricare beneficiary.  Total RX

submitted a claim for payment to Tricare on the basis of T.C.'s prescription. Tricare paid $18,569.39 to Total RX on the basis of the claim.

- On or around March 17, 2015, Medoc MSO physician Dr. David Simonak wrote a prescription for patient P.A., a Tricare beneficiary. Total RX submitted a claim for payment to Tricare on the basis of P.A.'s prescription. Tricare paid $5,782.53 to Total RX on the basis of the claim.

- On or around March 19, 2015, Medoc MSO physician Larry Kjeldgaard wrote a prescription for patient T.F., a Tricare beneficiary. Total RX submitted a claim for payment to Tricare on the basis of T.F.'s prescription. Tricare paid $6,346.00 to Total RX on the basis of the claim.

- On or around March 20, 2015, Medoc MSO physician Dr. David Simonak wrote a prescription for patient D.C., a Tricare beneficiary. Total RX submitted a claim for payment to Tricare on the basis of D.C.'s prescription. Tricare paid $17,896.43 to Total RX on the basis of the claim.

- On or around March 30, 2015, Medoc MSO physician Dr. Kamlesh Sisodiya wrote a prescription for patient J.E., a Medicare Part D beneficiary. On March 31, 2015, Total RX submitted a claim for payment to Medicare Part D on the basis of J.E.'s prescription. Medicare Part D paid $536.49 to Total RX on the basis of the claim.

172. The prescriptions, claims for payment, and payments to Total RX identified in the preceding paragraph merely represent a few examples of federal program patient prescriptions that the Medoc Defendants directed to Total RX from January 30, 2015 through March 31, 2015.

173. Each of the claims Total RX submitted in connection with the above-referenced examples—and every other claim submitted by Total RX on the basis of federal program patient prescriptions directed to Total RX by the Medoc Defendants from January 30, 2015 through March 31, 2015—are false because they are tainted by the $213,554.26 kickback payment from Total RX to the Medoc Defendants.

174.    The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by orchestrating the execution of a sham employment agreement between Michael Schneider and Total RX to extract kickbacks from Total RX on the basis of federal program patient prescriptions.

175.    The Total RX Defendants knowingly submitted false claims by agreeing to pay the $213,554.26 kickback to the Medoc Defendants to induce and/or recompense the Medoc Defendants for directing federal healthcare program patient prescriptions to Total RX from January 30, 2015 through March 31, 2015.

176.    From January 30, 2015 through March 31, 2015, Total RX submitted over 200 false claims to federal healthcare programs, resulting in payment to Total RX in excess of $1 million by the United States.

**b.    April referrals result in May kickback payments.**

177.    After the Total RX Defendants agreed to hire Michael Schneider as a W2 employee and pay him "wages" in return for federal healthcare program prescriptions, the Medoc Defendants expected regular payments—and detailed data supporting those payments—from Nguyen and Total RX.

178.    By May 2015, the sham employment agreement was in place, the Medoc Defendants had set up Barolo to divide up Michael's "salary," and the Medoc Defendants were increasing their referrals of federal program patient prescriptions to Total RX.  In fact, on May 8, 2015, Medoc MSO physician Dr. Paul Marciano emailed Kevin Kuykendall asking about Medicare and Tricare patients.  Kuykendall responded: "Our

pharmacy already supports Medicare, Medicaid, and Tricare so the physicians should be sending all scripts to TotalRX."

179.   Under the control and direction of the Medoc Defendants, MSO physicians continued to send their federal program patient prescriptions to Total RX.  And each month, the Medoc Defendants solicited and received their kickbacks from the Total RX Defendants in return for those referrals.

180.   The Total RX EAW spreadsheet also includes a tab labeled "Michael Schneider April," which lists federal referrals from MSO physicians to Total RX during the month of April 2015, and the corresponding reimbursements from federal government healthcare programs.  On the basis of the federal program patient prescriptions referred to Total RX by the Medoc Defendants, the spreadsheet calculates Schneider's "Total Commission," factoring in a "$2500 draw," as well as a Total Commission after withholding taxes (i.e., Total Commission with Tax W/H), as shown below:

| TOTAL INS DUE | | $828,058.44 |
|---|---|---|
| TOTAL COST | $ | 163,134.35 |
| TOTAL COMMISSION | $ | 265,969.64 |
| Less $2500 draw | $ | 263,469.64 |
| Total Commission with Tax W/H | $ | 259,703.93 |
| Taxable amount | $ | (70,215.98) |

181.    As shown above, the spreadsheet calculated total commissions after taxes of $259,703.93 to be paid to Michael Schneider for federal referrals that the Medoc Defendants directed to Total RX for fulfillment in April 2015.

182.    The Barolo Distribution Spreadsheet's entries for May again match the numbers from the Total RX EAW spreadsheet.  According to the Barolo spreadsheet, the Total RX Defendants paid Michael Schneider $1,250 on May 1 and May 15, 2015— together, the $2,500 draw.  On May 15, 2015, the Barolo spreadsheet shows that Schneider was paid $259,703.93, the same amount shown above for "Total Commission with Tax W/H."

**Barolo Account Activity**

| Date | Gross Check Amount | K&S | MCS | Perf. Biomed. | Radix | Shemiyah |
|------|------|------|------|------|------|------|
| **Incoming** | | | | | | |
| 4/17/15 | $   213,554.26 | 56,378.32 | 56,378.32 | 42,710.85 | 1,708.43 | 56,378.32 |
| 5/1/15 | $     1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 5/15/15 | $   259,703.93 | 68,561.84 | 68,561.84 | 51,940.79 | 2,077.63 | 68,561.84 |
| 5/15/15 | $     1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |

183.    The Barolo Distribution Spreadsheet shows that both the $2,500 "draw" and the $259,703.93 payment were divided among the Medoc Defendants—in particular, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Michael Schneider, Trenton Moody, and Moky Cheung.

184.    On May 21, 2015, Sabrina Kuykendall emailed Nguyen asking how he came up with the "$259k gross for Michael's employee at will amount."  Michael Schneider was not on the email.  Sabrina states that she used the "raw data provided as of

May 6th," but her calculation resulted in "somewhere around $367k" for the kickback amount.  Nguyen forwarded Sabrina's question to Moky Cheung.

185.    On May 24, 2015, Kevin Kuykendall emailed Michael Nguyen that he "received the Federal revenue from Moky" and asked Nguyen to "please make sure the Employee at Will numbers/payments are correct."  Again, Michael Schneider—the putative "Employee at Will"—was not included on the email communication.

186.    In a follow-up email, Nguyen indicated that he needed to "sit down and discuss with Moky his calculations."  Kuykendall responded: "I believe Sabrina had a call with Moky tonight so they're close (except on the taxes re: employee at will).  Feel free to call Sabrina tomorrow when you're ready."  Again, Michael Schneider was not included on the email communications.

187.    On May 25, 2015, Sabrina Kuykendall emailed Moky Cheung, Nguyen, Kevin Kuykendall, and Michael Schneider: "In speaking with Moky tonight, we went through Federal Payments and got what should be the correct numbers for April.  That being said, I believe it would be great for all of us to hop on a quick call tomorrow to go over the information below."  Kevin Kuykendall forwarded the exchange to Mark Schneider and added "when we're all in the same office, it will be easy for Sabrina to sit down with us both at the same time."

188.    During the course of the foregoing emails and conversations, each of the Medoc Defendants and the Total RX Defendants continued to participate in and further their agreement to mask kickback payments on federal referrals from Total RX to the Medoc Defendants as "wages" to Michael Schneider.

189.   In sum, in May 2015, the Total RX Defendants paid $259,701.93 in kickbacks to the Medoc Defendants through the sham Michael Schneider employment agreement for federal referrals sent to Total RX in April 2015 alone.

190.   The $259,701.93 was an inducement and reward paid by the Total RX Defendants to Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky Cheung in return for arranging for the referral of federal healthcare program patients to Total RX during April 2015 and into the future.

191.   During April 2015, the Medoc Defendants arranged for the referral of numerous federal healthcare program patient prescriptions from MSO physicians to Total RX for fulfillment.  Each of these claims was false because it was tainted by the kickbacks that the Medoc Defendants solicited and received from the Total RX Defendants through the sham employment agreement with Michael Schneider.  Those kickbacks were meant to and did reward and induce the federal program patient referrals. Most, if not all, of these prescriptions are included in the Total RX EAW spreadsheet, which tracked and identified referrals arranged by the Medoc Defendants to the Total RX Defendants.  Examples of federal program patient prescriptions referred by the Medoc Defendants to Total RX during this time period include the following:

- On or around April 28, 2015, Medoc MSO physician Dr. Kamlesh Sisodiya wrote a prescription for patient J.E., a Medicare Part D beneficiary.  Total RX submitted a claim for payment to Medicare Part D on the basis of J.E.'s prescription.  Medicare Part D paid $540.37 to Total RX on the claim.

- On or around April 17, 2015—the same day as the first Total RX "commission" payment to Michael Schneider—Medoc MSO physician Dr. Nicholas Iagulli wrote a prescription for patient K.S., a DOL beneficiary.

Total RX submitted a claim for payment to DOL on the basis of K.S.'s prescription.  DOL paid $19,261.88 to Total RX on the basis of the claim.

192.     The prescriptions, claims for payment, and payments to Total RX identified in the preceding paragraph merely represent a few examples of federal program patient prescriptions that the Medoc Defendants directed to Total RX in April 2015.

193.     Each of the claims Total RX submitted in connection with the above-referenced examples—and every other claim submitted by Total RX on the basis of federal program patient prescriptions directed to Total RX by the Medoc Defendants in April 2015—are false because they are tainted by the $259,701.93 kickback payment from Total RX to the Medoc Defendants.

194.     The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by orchestrating the execution of a sham employment agreement between Michael Schneider and Total RX to extract kickbacks from Total RX on the basis of federal program patient prescriptions.

195.     The Total RX Defendants knowingly submitted false claims by agreeing to pay the $259,701.93 kickback to the Medoc Defendants to induce and/or recompense the Medoc Defendants for directing federal healthcare program patient prescriptions to Total RX in April 2015.

196.     In April 2015, Total RX submitted approximately 174 false claims to federal healthcare programs, resulting in Total RX receiving payments made by Medicare, Tricare, and Department of Labor of approximately $1.2 million.

197.    The Medoc Defendants had a practice of adding additional terms to employment contracts to make them *look* more legitimate.  For example, Kevin Kuykendall added a reference to operating room responsibilities to the new employment agreement of an MSO representative—who also happened to be the son of a major MSO physician.  Kuykendall said the extra terms made the contract look more legitimate and helped support the amount of money being paid to the son, as shown below:

**From:** kevink@medoc-llc.com [mailto:kevink@medoc-llc.com]
**Sent:** Tuesday, July 28, 2015 12:12 PM
**To:** sabrinak@medoc-llc.com
**Subject:** Re: Employee at Will Agreement

I spoke with Mitchell, and his only question was about the operating room responsibilities. I explained to Michell that we added the operating room responsibilities in order to make the contract more legitimate and expanding his role that would support the amount of money being paid to him.

198.    On May 26, 2015, Kevin Kuykendall emailed Nguyen about the "Employee at Will," Michael Schneider.  Kuykendall suggested that Nguyen "show more control" over the employee at will, as shown below:

## Employee at Will

| | |
|---|---|
| **From:** | Kevin Kuykendall <kevink@medoc-llc.com> |
| **To:** | Michael Nguyen <michael@totalrx.com> |
| **Date:** | Tue, 26 May 2015 09:02:22 -0500 |

Let's discuss how you show more control of the employee at will:

These are good:
Reps/Warranties
          Fraud/Waste and Abuse
Standard Operating Policies
Pharmacy HIPPA plan/training

This needs to be beefed up and followed up on:
Monthly basis submit time/sales report

199.    These proposed changes were attempts to make Michael Schneider look like an actual employee of Total RX.  But he was not.  For example, Michael Schneider did not submit monthly "time" reports to the Total RX Defendants.  And while Sabrina Kuykendall did send the Total RX Defendants monthly calculations demanding kickback payments intended for the Medoc Defendants—those calculations were not prepared or sent by Michael Schneider (though he was aware of them and profited from them).

### c.    May referrals result in June kickback payments.

200.    Sabrina Kuykendall's Barolo Distribution Spreadsheet shows that on June 12, 2015, a $201,932.99 payment was made to Michael Schneider by Total RX.  The Barolo Distribution Spreadsheet further shows that this money was then divided among the Medoc partners—in particular, Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky Cheung—through Barolo:

| Date | Gross Check Amount | K&S | MCS | Perf. Biomed. | Radix | Shemiyah |
|---|---|---|---|---|---|---|
| **Incoming** | | | | | | |
| 4/17/15 | $  213,554.26 | 56,378.32 | 56,378.32 | 42,710.85 | 1,708.43 | 56,378.32 |
| 5/1/15 | $    1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 5/15/15 | $  259,703.93 | 68,561.84 | 68,561.84 | 51,940.79 | 2,077.63 | 68,561.84 |
| 5/15/15 | $    1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 6/12/15 | $  201,932.99 | 53,310.31 | 53,310.31 | 40,386.60 | 1,615.46 | 53,310.31 |

201.    In other words, in June 2015, the Total RX Defendants paid $201,932.99 in kickbacks to the Medoc Defendants through the sham Michael Schneider employment agreement for federal referrals sent to Total RX in May 2015.

202.    The $201,932.99 payment was an inducement and a reward paid by the Total RX Defendants to Defendants Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Michael Schneider, Trenton Moody, and Moky Cheung in return for arranging for the referral of federal healthcare program patients to Total RX during May 2015 and into the future.

203.    During May 2015, the Medoc Defendants arranged for the referral of numerous federal healthcare program patient prescriptions from MSO physicians to Total RX for fulfillment.  Each of these claims was false because it was tainted by the kickbacks that the Medoc Defendants solicited and received from the Total RX Defendants through the sham employment agreement with Michael Schneider.  Those kickbacks were meant to and did reward and induce the federal program patient referrals. Together, the Defendants tracked and identified referrals arranged by the Medoc Defendants to the Total RX Defendants.  Examples of federal program patient prescriptions referred by the Medoc Defendants to Total RX during this time period include the following:

- On or before May 7, 2015, Medoc MSO physician Dr. Scott Gibson wrote a prescription for patient T.G., a Medicare Part D beneficiary.  Total RX submitted a claim for payment for Lidocaine/Prilocaine to Medicare Part D on the basis of T.G.'s prescription.  Medicare Part D paid $411.67 to Total RX on the claim.

- On or before May 11, 2015, Medoc MSO physician Dr. Raymond Westbrook wrote a prescription for patient H.S., a Tricare beneficiary. Total RX submitted a claim for payment for Coenzyme Q-10 Powder to Tricare on the basis of H.S.'s prescription.  Tricare paid $9,794.54 to Total RX on the basis of the claim.

- On or before May 14, 2015, Medoc MSO physician Dr. Nicholas Iagulli wrote a prescription for a compound cream for patient R.W., a DOL beneficiary.  Total RX submitted a claim for payment to DOL on the basis of R.W.'s prescription.  DOL paid $6,519.63 to Total RX on the basis of the claim.

204.   The prescriptions, claims for payment, and payments to Total RX identified in the preceding paragraph merely represent a few examples of federal program patient prescriptions that the Medoc Defendants directed to Total RX in May 2015.

205.   Each of the claims Total RX submitted in connection with the above-referenced examples—and every other claim submitted by Total RX on the basis of federal program patient prescriptions directed to Total RX by the Medoc Defendants in May 2015—are false because they are tainted by the $201,932.99 kickback payment from Total RX to the Medoc Defendants.

206.   The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by orchestrating the execution of a sham employment agreement between Michael Schneider and Total RX to extract kickbacks from Total RX on the basis of federal program patient prescriptions.

207.   The Total RX Defendants knowingly submitted false claims by agreeing to pay the $201,932.99 kickback to the Medoc Defendants to induce and/or recompense the Medoc Defendants for directing federal healthcare program patient prescriptions to Total RX in May 2015.

### d. April kickbacks are "adjusted" upward; June referrals result in July kickback payments.

208.    On July 21, 2015, Sabrina Kuykendall emailed Kevin Kuykendall and

Nguyen about the "EAW June values": "I wanted to double check with you that you got

the Employee at Will chart that I sent out to you about 10 days ago for you to give to

Paychex since I know that will be coming on Friday right?  I'm putting it below so you

have it and don't have to dig for it."  The chart was titled "Federal Calcs (w/Adjustment

from Last month)":

| Federal Calcs (w/Adjustment from Last month) | | | |
|---|---|---|---|
| | | June | Revision from April (never paid to MS) |
| Gross Adjudications | | $ 515,346.08 | |
| COGS | | $ 92,797.24 | |
| Net Profit | | $ 422,548.84 | |
| | | | |
| Michael Schneider (45%) | $ 241,811.98 | $ 190,146.98 | $ 51,665.00 |
| Salary | $ (2,500.00) | $ (2,500.00) | $ – |
| Taxes | $ (3,470.02) | $ (2,720.88) | $ (749.14) |
| Net amount | $ 235,841.95 | $ 184,926.10 | $ 50,915.86 |
| | | | |
| Michael Schneider | | | |
| Gross Amount to give to Paychex | $ 235,841.95 | $ 184,926.10 | $ 50,915.86 |
| Taxable Amount for Paychex | $ 63,838.36 | $ 50,198.80 | $ 13,639.56 |

209.    As shown above, the $235,841.95 includes revised numbers from Total

RX's April payment to Michael Schneider—meaning additional "commissions" to

Michael Schneider in connection with federal program patient prescriptions that the

Medoc Defendants directed to Total RX from January through March 31, 2015, before

Schneider executed his sham employment agreement with Total RX.

210.   The $235,841.95 "Gross Amount to give to Paychex" in the chart above

matches a July 24, 2015 entry in the Barolo Distribution Spreadsheet:

| Date | Gross Check Amount | K&S | MCS | Perf. Biomed. | Radix | Shemiyah |
|------|------|------|------|------|------|------|
| **Incoming** | | | | | | |
| 4/17/15 | $ 213,554.26 | 56,378.32 | 56,378.32 | 42,710.85 | 1,708.43 | 56,378.32 |
| 5/1/15 | $ 1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 5/15/15 | $ 259,703.93 | 68,561.84 | 68,561.84 | 51,940.79 | 2,077.63 | 68,561.84 |
| 5/15/15 | $ 1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 6/12/15 | $ 201,932.99 | 53,310.31 | 53,310.31 | 40,386.60 | 1,615.46 | 53,310.31 |
| 6/12/15 | $ 1,153.85 | 304.62 | 304.62 | 230.77 | 9.23 | 304.62 |
| 6/26/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 7/10/15 | $ 1,347.00 | 305.71 | 305.71 | 231.60 | 9.26 | 305.71 |
| 7/24/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 7/24/15 | $ 235,841.95 | 62,262.28 | 62,262.28 | 47,168.39 | 1,886.74 | 62,262.28 |

211.   The spreadsheet also shows that the July 24, 2015 payment of $235,841.95

was divided among the Medoc partners—in particular, Defendants Kevin Kuykendall,

Sabrina Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky

Cheung—through Barolo.

212.   In other words, in July 2015, the Total RX Defendant paid $235,841.95 in

kickbacks to the Medoc Defendants through the sham Michael Schneider employment

agreement for federal referrals sent to Total RX in June 2015 and for certain federal

referrals sent to Total RX from January through March 2015.

213.   The $235,841.95 payment was an inducement and reward paid by the Total

RX Defendants to Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody,

Mark Schneider, Michael Schneider, and Moky Cheung in return for arranging for the

referral of federal healthcare program patients to Total RX from January through March

2015, in June 2015, and into the future.

214.    During June 2015, the Medoc Defendants arranged for the referral of

numerous federal healthcare program patient prescriptions from MSO physicians to Total

RX for fulfillment.  Each of these claims was false because it was tainted by the

kickbacks that the Medoc Defendants solicited and received from the Total RX

Defendants through the sham employment agreement with Michael Schneider.  Those

kickbacks were meant to and did reward and induce the federal program patient referrals.

Together, the Defendants tracked and identified referrals arranged by the Medoc

Defendants to the Total RX Defendants.  Examples of federal program patient

prescriptions referred by the Medoc Defendants to Total RX during this time period

include the following:

- On or around June 4, 2015, Medoc MSO physician Dr. Nicholas Iagulli wrote a prescription for patient B.D., a DOL beneficiary.  Total RX submitted a claim for payment to DOL on the basis of B.D.'s prescription. DOL paid $7,786.04 to Total RX on the basis of the claim.

- On or around June 8, 2015, Medoc MSO physician Dr. Richard Adams wrote a prescription for patient R.F., a Medicare Part D beneficiary.  Total RX submitted a claim for payment for Lidocaine/Prilocaine to Medicare Part D on the basis of R.F.'s prescription.  Medicare Part D paid $396.99 to Total RX on the basis of the claim.

215.    The prescriptions, claims for payment, and payments to Total RX identified

in the preceding paragraph merely represent a few examples of federal program patient

prescriptions that the Medoc Defendants directed to Total RX in June 2015.

216.    Each of the claims Total RX submitted in connection with the above-

referenced examples—and every other claim submitted by Total RX on the basis of

federal program patient prescriptions directed to Total RX by the Medoc Defendants in

June 2015—are false because they are tainted by the $235,841.95 kickback payment from Total RX to the Medoc Defendants.

217.    The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by orchestrating the execution of a sham employment agreement between Michael Schneider and Total RX to extract kickbacks from Total RX on the basis of federal program patient prescriptions.

218.    The Total RX Defendants knowingly submitted false claims by agreeing to pay the $235,841.95 kickback to the Medoc Defendants to induce and/or recompense the Medoc Defendants for directing federal healthcare program patient prescriptions to Total RX in June 2015.

### e.    July referrals result in August kickback payments.

219.    On August 12, 2015, Sabrina Kuykendall emailed Michael Schneider and Kevin Kuykendall that "barring any changes from my analysis over the next few days, see below for the chart values that Michael [Nguyen] has for the July Employee at Will values."  The "Gross Amount to give to Paychex" was $232,665.08.

220.    On August 19, 2015, Sabrina Kuykendall emailed Nguyen and Kevin Kuykendall about the "JULY TOTALRX values for Medoc commission and Federal": "Please see below for the proper numbers related to Employee at Will for July."  As shown below, Michael Schneider was not included on that email:

**RE: JULY TOTALRX values for Medoc commission and Federal**

| | |
|---|---|
| From: | Sabrina Kuykendall <sabrinak@medoc-llc.com> |
| To: | Michael Nguyen <michael@totalrx.com> |
| Cc: | Kevin Kuykendall <kevink@medoc-llc.com> |
| Date: | Wed, 19 Aug 2015 11:58:23 -0500 |

Michael-
Please see below for the proper numbers related to Employee at Will for July. I had to go back and include ONLY Total RX values since that who Michael has the agreement with. Let me know if you have any additional questions or need anything else.

| Federal Employee at Will - July | | |
|---|---|---|
| | **July** | |
| Gross Adjudications | $ 620,957.99 | includes TotalRX only |
| COGS | $ 93,542.50 | |
| Net Profit | $ 527,415.49 | |
| | | |
| Michael Schneider (45%) | $ 237,336.97 | |
| Salary | $ (2,500.00) | |
| Taxes | $ (3,441.39) | |
| Net amount | $ 231,395.58 | |
| | | |
| Michael Schneider | | |
| Gross Amount to give to Paychex | $ 231,395.58 | |
| Taxable Amount for Paychex | $ 61,088.43 | |

221.   The $231,395.58 "Gross Amount to give to Paychex" in the "Federal

Employee at Will – July" chart shown above matches the August 21, 2015 entry in the

Barolo Distribution Spreadsheet, which is excerpted below:

| Date | Gross Check Amount | K&S | MCS | Perf. Biomed. | Radix | Shemiyah |
|---|---|---|---|---|---|---|
| **Incoming** | | | | | | |
| 4/17/15 | $ 213,554.26 | 56,378.32 | 56,378.32 | 42,710.85 | 1,708.43 | 56,378.32 |
| 5/1/15 | $ 1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 5/15/15 | $ 259,703.93 | 68,561.84 | 68,561.84 | 51,940.79 | 2,077.63 | 68,561.84 |
| 5/15/15 | $ 1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 6/12/15 | $ 201,932.99 | 53,310.31 | 53,310.31 | 40,386.60 | 1,615.46 | 53,310.31 |
| 6/12/15 | $ 1,153.85 | 304.62 | 304.62 | 230.77 | 9.23 | 304.62 |
| 6/26/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 7/10/15 | $ 1,347.00 | 305.71 | 305.71 | 231.60 | 9.26 | 305.71 |
| 7/24/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 7/24/15 | $ 235,841.95 | 62,262.28 | 62,262.28 | 47,168.39 | 1,886.74 | 62,262.28 |
| 8/7/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 8/21/15 | $ - | - | - | - | - | - |
| 8/21/15 | $ 231,395.58 | 61,088.43 | 61,088.43 | 46,279.12 | 1,851.16 | 61,088.43 |
| **TOTAL** | $ 1,151,179.56 | $ 303,714.30 | $ 303,714.30 | $ 230,086.59 | $ 9,203.46 | $ 303,714.30 |

222.     The spreadsheet also shows that the August 21, 2015 payment of $231,395.58 was divided among the Medoc partners—in particular, Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky Cheung—through Barolo.

223.     In sum, in August 2015, the Total RX Defendants paid $231,395.58 in kickbacks to the Medoc Defendants through the sham Michael Schneider employment agreement for federal referrals sent to Total RX in July 2015.

224.     The $231,395.58 payment was an inducement and reward to Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky Cheung in return for arranging for the referral of federal healthcare program patients to Total RX during July 2015 and into the future.

225.     During July 2015, the Medoc Defendants arranged for the referral of numerous federal healthcare program patient prescriptions from MSO physicians to Total RX for fulfillment.  Each of these claims was false because it was tainted by the kickbacks that the Medoc Defendants solicited and received from the Total RX Defendants through the sham employment agreement with Michael Schneider.  Those kickbacks were meant to and did reward and induce the federal program patient referrals. Together, the Defendants tracked and identified referrals arranged by the Medoc Defendants to the Total RX Defendants.  Examples of federal program patient prescriptions referred by the Medoc Defendants to Total RX during this time period include the following:

- On or around July 1, 2015, Medoc MSO physician Dr. Nicholas Iagulli wrote a prescription for patient G.W., a DOL beneficiary. Total RX submitted a claim for payment for a compound product to DOL on the basis of G.W.'s prescription. DOL paid $7,417.17 to Total RX on the claim.

- On July 29, 2015, Total RX submitted another claim for payment for a compound product to DOL on the basis of G.W.'s prescription. DOL paid Total RX $7,226.77 on the claim.

226.    The prescriptions, claims for payment, and payments to Total RX identified in the preceding paragraph merely represent a few examples of federal program patient prescriptions that the Medoc Defendants directed to Total RX in July 2015.

227.    Each of the claims Total RX submitted in connection with the above-referenced examples—and every other claim submitted by Total RX on the basis of federal program patient prescriptions directed to Total RX by the Medoc Defendants in July 2015—are false because they are tainted by the $231,395.58 kickback payment from Total RX to the Medoc Defendants.

228.    The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by orchestrating the execution of a sham employment agreement between Michael Schneider and Total RX to extract kickbacks from Total RX on the basis of federal program patient prescriptions.

229.    The Total RX Defendants knowingly submitted false claims by agreeing to pay the $231,395.58 kickback to the Medoc Defendants to induce and/or recompense the Medoc Defendants for directing federal healthcare program patient prescriptions to Total RX in July 2015.

230.   From April 2015 through July 2015, the Medoc Defendants directed prescriptions for hundreds of federal healthcare program patients from MSO physicians to Total RX.  As a result, the Total RX Defendants submitted over 500 claims to federal healthcare programs, resulting in the United States paying over $2.7 million to Total RX.

231.   Between April and August of 2015, the Total RX Defendants made over $1 million in kickback payments to the Medoc Defendants through the Michael Schneider sham employment agreement.  One purpose—if not the only purpose—of those kickback payments was to induce and reward the Medoc Defendants for arranging the referral of federal program patient prescriptions to Total RX during the same period of time, and into the future.

232.   The kickbacks from the Total RX Defendants to the Medoc Defendants tainted each and every claim for payment submitted by Total RX to federal healthcare programs on the basis of referrals arranged by the Medoc Defendants from MSO physicians.

233.   The Medoc Defendants knowingly caused the submission of those over 500 kickback-tainted false claims for payment to the United States by soliciting and receiving kickbacks from the Total RX Defendants through the Michael Schneider sham employment agreement.

234.   The Total RX Defendants knowingly submitted those over 500 kickback-tainted false claims for payment to the United States by paying over $1 million in kickbacks to the Medoc Defendants to induce and reward the Medoc Defendants for

arranging for the referral of federal program patient prescriptions from MSO physicians to Total RX.

### f.       The end of the Total RX Sham Employment Scheme

235.    On August 26, 2015, Nguyen notified Kevin Kuykendall and Mark Schneider that Total RX would be undergoing an on-site Tricare audit on September 9, 2015.

236.    On September 1, 2015, in an email with the subject "Barolo – Employee at Will calcs," Sabrina Kuykendall sent the Barolo Distribution Spreadsheet to Kevin Kuykendall and Michael Schneider.  She noted that Schneider would first need to put $171,090.35 into the Barolo account so that Sabrina could make distributions to other partners in Barolo, namely Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Trenton Moody, and Moky Cheung.

237.    Shortly thereafter, Michael Schneider responded to Sabrina and Kevin Kuykendall: "Thank you Sabrina.  If you'll send me the Barolo account (it is not on that one piece of paper with the other accounts) I'll call my banker and get it taken care of."

238.    Also on September 1, 2015, Sabrina Kuykendall emailed Mark Schneider regarding Barolo: "Tonight when you get home, please transfer FROM Barolo (#6927) into your MCS Interests account for payment for July services."  After Schneider responded that $1,143.36 was left in the account, Sabrina replied: "We are waiting to see how August turned out before we do anything further with the account.  Since Doctor's Specialty pharmacy didn't start until this past weekend..........we will probably have to do Barolo for another month but I'm sure we will know more after the board meeting

tomorrow night" (ellipses in original).  Mark Schneider, Michael Schneider, Sabrina

Kuykendall, and Kevin Kuykendall were all on this email exchange about doing Barolo

for another month.

239.    This email evinces the ongoing agreement among the Medoc Defendants—

along with the Total RX Defendants—to send federal program patient referrals to Total

RX in return for kickbacks from Nguyen and Total RX under the guise of wages to

Michael Schneider.  As part of this agreement, Schneider further agreed to split up his

"wages" from Total RX with his fellow Medoc Defendants by depositing the funds into

Barolo's bank account.

240.    The Defendants did indeed continue "to do Barolo", i.e., funnel kickbacks

from the Total RX Defendants to the Medoc Defendants through Michael Schneider and

Barolo, for one more month.  But the putative employee was being told this by Sabrina

Kuykendall, not the other way around—because Michael Schneider did not actually go to

Total RX, work for Total RX, or perform services for Total RX.  Nguyen and Total RX

also knew of and agreed with the plan to continue "to do Barolo" for another month, and

continued to participate in the sham of paying kickbacks to the Medoc Defendants under

the guise of "wages" to Michael Schneider.

241.    On September 22, 2015, Sabrina Kuykendall emailed Nguyen, copying

Kevin Kuykendall (but not Michael Schneider), regarding the "Employee at Will calcs

for August."  When referencing the EAW numbers for August, Sabrina put the term

"salary" in scare quotes—twice, as shown below.

From: Sabrina Kuykendall [mailto:sabrinak@medoc-llc.com]
Sent: Tuesday, September 22, 2015 6:51 PM
To: Michael Nguyen <michael@totalrx.com>
Cc: Kevin Kuykendall <kevink@medoc-llc.com>
Subject: Employee at Will calcs for August

Michael -

Please see below for the proper numbers related to Employee at Will for August. I wasn't sure if you have or have not paid Michael his "salary" but see below for the values. Please let me know he is getting his "salary" because that is my assumption. For August, I only included Total RX values since that who Michael has the agreement with. Let me know if you have any additional questions or need anything else. Thanks and please send Messorio numbers as you see them for August as soon as you can so we can get that done in the next few days as well. I will gather the Saratoga and Elgin stuff so we can close Messorio ASAP. Thanks!

242.    Sabrina Kuykendall, Kevin Kuykendall, and Michael Nguyen all understood that Michael Schneider's "salary" was in fact a kickback from the Total RX Defendants to the Medoc Defendants in return for arranging the referral of federal program patient prescriptions to Total RX.

243.    Each of the Defendants—both the Medoc Defendants and the Total RX Defendants—understood and agreed to engage in a scheme to pay kickbacks under the guise of this "salary" to Michael Schneider so they could continue to swap cash for federal referrals, despite knowing that it violated the AKS and the FCA.

244.    The "salary" identified in Sabrina Kuykendall's email—that is, the kickbacks to the Medoc Defendants for federal referrals in August—was identified in Sabrina's email as $25,870.62, plus the $2,500 draw, as shown below:

| Federal Employee at Will - August | | includes Total RX only |
|---|---|---|
| | **August** | |
| Gross Adjudications | $   85,721.39 | includes Total RX only |
| COGS | $   21,747.95 | |
| Net Profit | $   63,973.44 | |
| | | |
| Michael Schneider (45%) | $   28,788.05 | |
| Salary | $   (2,500.00) | |
| Taxes | $   (417.43) | |
| Net amount | $   25,870.62 | |
| | | |
| **Michael Schneider** | | |
| Gross Amount to give to Paychex | $   25,870.62 | |
| Taxable Amount for Paychex | $   5,647.56 | |

245.     In September 2015, the Total RX Defendants paid $25,870.62 in kickbacks to the Medoc Defendants through the sham Michael Schneider employment agreement for federal referrals sent to Total RX in August 2015.

246.     The $25,870.62 was an inducement and reward paid by the Total RX Defendants to Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, Michael Schneider, and Moky Cheung in return for arranging for the referral of federal healthcare program patients to Total RX during August 2015.

247.     During August 2015, the Medoc Defendants arranged for the referral of numerous federal healthcare program patient prescriptions from MSO physicians to Total RX for fulfillment.  Each of these claims was false because it was tainted by the kickbacks that the Medoc Defendants solicited and received from the Total RX Defendants through the sham employment agreement with Michael Schneider.  Those kickbacks were meant to and did reward and induce the federal program patient referrals.

Together, the Defendants tracked and identified referrals arranged by the Medoc

Defendants to the Total RX Defendants.  Examples of federal program patient

prescriptions referred by the Medoc Defendants to Total RX during this time period

include the following:

- On or before August 17, 2015, Medoc MSO physician Dr. Lorraine Rudder wrote a prescription for patient B.L., a DOL beneficiary.  Total RX submitted a claim for payment for a compound product to DOL on the basis of B.L.'s prescription.  DOL paid $14,983.39 to Total RX on the claim.

248.    The prescription, claim for payment, and payment to Total RX identified in

the preceding paragraph merely represent one example of a federal program patient

prescription that the Medoc Defendants directed to Total RX in August 2015.

249.    Each of the claims Total RX submitted in connection with the above-

referenced example—and every other claim submitted by Total RX on the basis of

federal program patient prescriptions directed to Total RX by the Medoc Defendants in

August 2015—are false because they are tainted by the $25,870.62 kickback payment

from Total RX to the Medoc Defendants.

250.    The Medoc Defendants knowingly caused the submission of these

kickback-tainted false claims by orchestrating the execution of a sham employment

agreement between Michael Schneider and Total RX to extract kickbacks from Total RX

on the basis of federal program patient prescriptions.

251.    The Total RX Defendants knowingly submitted false claims by agreeing to

pay the $25,870.62 kickback to the Medoc Defendants to induce and/or recompense the

Medoc Defendants for directing federal healthcare program patient prescriptions to Total RX in August 2015.

252.    On or around August 17, 2015, Kevin Kuykendall—on behalf of a separate shell company called Vintage Grow Investment Partners I—executed a remuneration arrangement with Doctor's Specialty Pharmacy (DSP) that was more lucrative than the sham Total RX employment agreement.  After that, the Medoc Defendants routed federal referrals to DSP as part of a new kickback scheme, as discussed in greater detail below.

253.    Defendant Michael Nguyen continued to work with the Medoc Defendants to solicit and receive kickbacks from pharmacies in return for kickbacks on both private pay and federal program patient prescriptions.  After the Medoc Defendants agreed to share kickback money through DSP rather than Total RX, they continued to arrange private pay referrals to Total RX.

### g.    Summary of Total RX Sham Employment Scheme

254.    According to Sabrina Kuykendall's Barolo Distribution Spreadsheet, excerpted below, Total RX paid the Medoc Defendants at least $1,151,179.56 through the Michael Schneider sham employment agreement between April and September of 2015 in reward for and to induce the arrangement of federal program patient prescriptions from MSO physicians to Total RX for fulfillment.

**Barolo Account Activity**

| Date | Gross Check Amount | K&S | MCS | Perf. Biomed. | Radix | Shemiyah |
|------|-------------------|-----|-----|---------------|-------|----------|
| **Incoming** | | | | | | |
| 4/17/15 | $ 213,554.26 | 56,378.32 | 56,378.32 | 42,710.85 | 1,708.43 | 56,378.32 |
| 5/1/15 | $ 1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 5/15/15 | $ 259,703.93 | 68,561.84 | 68,561.84 | 51,940.79 | 2,077.63 | 68,561.84 |
| 5/15/15 | $ 1,250.00 | 330.00 | 330.00 | 250.00 | 10.00 | 330.00 |
| 6/12/15 | $ 201,932.99 | 53,310.31 | 53,310.31 | 40,386.60 | 1,615.46 | 53,310.31 |
| 6/12/15 | $ 1,153.85 | 304.62 | 304.62 | 230.77 | 9.23 | 304.62 |
| 6/26/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 7/10/15 | $ 1,347.00 | 305.71 | 305.71 | 231.60 | 9.26 | 305.71 |
| 7/24/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 7/24/15 | $ 235,841.95 | 62,262.28 | 62,262.28 | 47,168.39 | 1,886.74 | 62,262.28 |
| 8/7/15 | $ 1,250.00 | 280.93 | 280.93 | 212.83 | 8.51 | 280.93 |
| 8/21/15 | $ - | - | - | - | - | - |
| 8/21/15 | $ 231,395.58 | 61,088.43 | 61,088.43 | 46,279.12 | 1,851.16 | 61,088.43 |
| **TOTAL** | **$ 1,151,179.56** | **$ 303,714.30** | **$ 303,714.30** | **$ 230,086.59** | **$ 9,203.46** | **$ 303,714.30** |

255.    During 2015, according to an IRS Form 1099-MISC, Michael Schneider through Shemiyah Holdings LP paid Barolo Partners LLC $846,718.65 in "Nonemployee compensation."  Michael Schneider made these payments to Barolo as part of his agreement with Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, Trenton Moody, and Moky Cheung to split the kickback payments extracted from the Total RX Defendants for the arrangement of federal referrals from the MSO physicians to Total RX.

256.    While the Total RX sham employment agreement was in effect, Total RX's volume of paid Medicare, Tricare, and DOL claims skyrocketed, exceeding $3.5 million dollars.  Prior to its relationship with the Medoc Defendants, Total RX was submitting virtually no claims to federal healthcare programs.  After the Total RX Defendants stopped paying kickbacks to Medoc's management for arranging federal referrals, Total

RX once again ceased submitting claims to federal healthcare programs.  The chart below illustrates the trend in Total RX's paid claims from Medicare, Tricare, and DOL before, during, and after the sham employment agreement.  The months during which the sham employment agreement was in effect are colored red:



257.    All told, from January 2015 through August 2015, the Medoc Defendants arranged for the referral of prescriptions for hundreds of federal healthcare program patients generated by MSO physicians to Total RX, each of which was tainted by the kickbacks the Medoc Defendants solicited and received from the Total RX Defendants.

258.    Total RX submitted approximately 800 kickback-tainted false claims to federal healthcare programs on the basis of those patients, resulting in Medicare Part D, Tricare, and DOL paying approximately $3.5 million for those false claims.

B.      **The Doctors Specialty Pharmacy Agreement (August 2015 through January 2016).**

259.    In July 2015, the Medoc Defendants were arranging for the referral of federal healthcare program patient prescriptions to Total RX and receiving kickbacks through the Total RX sham employment agreement.

260.    But in July 2015, Linda Kjeldgaard—a Medoc contractor in charge of several MSOs—expressed concerns to Kevin Kuykendall about Medoc's business. Kjeldgaard was concerned about the Medoc Defendants' insistence that MSO physicians—which included her husband, Dr. Larry Kjeldgaard—should send federal program patient prescriptions to Medoc, and the potential legal liability associated with those prescriptions.  In particular, Linda was concerned that the Medoc Defendants were pressuring MSO physicians to write referrals for federal program patients, such as Medicare beneficiaries, and that Medoc's payments to physician-investors could be viewed as kickbacks.

261.    Later that same month, the Medoc Defendants devised a new scheme to capture federal revenue—one that would allow them to obtain an even higher commission on federal referrals.

262.    On July 29, 2015, Sabrina Kuykendall emailed the other Medoc Defendants that they would "no longer be receiving Federal funds through Total RX and the employee at will from Total RX will be going away after July":

## Barolo distribution

**From:**   Sabrina Kuykendall <sabrinak@medoc-llc.com>
**To:**   Kevin Kuykendall <kevink@medoc-llc.com>
**Cc:**   Michael Schneider <michaels@medoc-llc.com>, Mark Schneider <marks@medoc-llc.com>,
Trenton Moody <trentonm@medoc-llc.com>, Moky Cheung <mokyc@medoc-llc.com>
**Date:**   Wed, 29 Jul 2015 11:39:18 -0500

Gentlemen-

As you know, we will no longer be receiving Federal funds through Total RX and the employee at will from Total RX will be going away after July. Based on June's values, I've put together the table below showing the approximate distribution that will be executed today to each of you. The reason it is not 100% accurate to the penny is that I need to verify one small thing from Michael S. but will do that today.

K&S, MCS = ~$62,500
Perf. Biomedical = ~$47,400
Radix = ~$1900

263.    Shortly thereafter, Trenton Moody responded to everyone on the email communication: "Thank you Sabrina.. And Linda :)."

## Re: Barolo distribution

**From:**   Trenton Moody <trentonm@medoc-llc.com>
**To:**   Sabrina Kuykendall <sabrinak@medoc-llc.com>
**Cc:**   Kevin Kuykendall <kevink@medoc-llc.com>, Michael Schneider <michaels@medoc-llc.com>,
Mark Schneider <marks@medoc-llc.com>, Moky Cheung <mokyc@medoc-llc.com>
**Date:**   Wed, 29 Jul 2015 12:16:13 -0500

Thank you Sabrina.. And Linda :)

264.    The Medoc Defendants, each of whom had agreed to solicit and receive kickbacks on federal program patient prescriptions through the sham Michael Schneider employee agreement and then divide the proceeds up amongst themselves, now agreed to move on to a new scheme to capture even higher kickbacks on the federal prescriptions generated by the MSO physicians.

**1.      The Medoc Defendants negotiate an even higher kickback on federal revenue from Doctors Specialty Pharmacy.**

265.    On July 22, 2015, Kevin Kuykendall exchanged emails with James Webb about a possible business relationship.  Through Preferred Medical Holdings, Webb owned a pharmacy called Doctor's Specialty Pharmacy (DSP) located near NorthPark Mall in Dallas, Texas.  Kuykendall indicated to Webb that Medoc was willing to arrange federal referrals to DSP.  Kuykendall also told Webb that DSP sounded like a "good fit" for Medoc's "federal business," as shown in the email below:

## RE: james webb - preferred medical holdings

| | |
|---|---|
| **From:** | Kevin Kuykendall <kevink@medoc-llc.com> |
| **To:** | jhw102559@aol.com |
| **Date:** | Wed, 22 Jul 2015 14:17:32 -0500 |

James,

Thanks for the email. I've scheduled a tour of the pharmacy with Tim for Monday at 10:30am. I have no idea why my partner and Clifford would be touring the facility.  However, nothing happens in Medoc that I don't approve.   The pharmacy sounds like a good fit for our federal business which averages over $1mm per month.   I'm sure we can work something out that is a win/win for us both.

266.    On August 11, 2015, Kevin Kuykendall emailed Webb's business partner, Tim Tate, about the possible Medoc-DSP arrangement.  Kuykendall informed Tate that Medoc "had to move over $500,000 worth of our Federal business to another *non-owned* pharmacy this past week." (emphasis added).

-------- Original message --------
From: Kevin Kuykendall
Date:08/11/2015 6:06 AM (GMT-08:00)
To: Tim Tate
Subject: North Park Pharmacy

Tim,

Please let us know about the Definitive Agreements we sent last week re: North Park Pharmacy.  It's imperative we get something in place this week.  We've had to move over $500,000 worth of our Federal business to another non-owned pharmacy this past week.  Therefore, we're losing money that could go into the N. Park Pharmacy.

267.    In other words, Kevin Kuykendall said that Medoc Defendants were "losing money" because they had to "move over $500,000 worth" of federal healthcare program prescriptions from their MSO physicians to a pharmacy that was not paying them kickbacks on federal referrals.  As a result, they wanted to put in place the DSP agreement as soon as possible, so they could stop routing federal referrals from MSO physicians to pharmacies without getting a cut of the profits.

268.    In response, Webb indicated that he just wanted to sell the pharmacy to Medoc.  He also raised risks associated with the potential Medoc-DSP business relationship.  In particular, Webb raised concerns that a Medoc-DSP financial relationship would create liability under the AKS.

269.    Kevin Kuykendall responded to Webb on August 12, 2015: "I understand the desire [to sell DSP to Medoc] but we need to insure that any change of control does not jeopardize the current contracts that are in place at the Pharmacy."

270.    On August 12, 2015, Tate emailed Kuykendall, Webb, Mark Schneider, and Steve Solomon that it was Preferred's "goal to have the papework buttoned-up by Monday July [sic] 17th so we can start filling prescriptions."  Kevin Kuykendall

responded, copying Schneider and Solomon: "Thanks so much.  We're looking forward to getting behind the wheel and driving the volume through the pharmacy."

271.    On August 14, 2015, Andrew Coney—a Total RX employee assisting the Medoc Defendants in their new DSP scheme at the direction of Nguyen—emailed Kevin Kuykendall that they needed to find out if DSP was set up for EFT for federal worker's compensation referrals, "if not we need to do it ASAP."  This would allow DSP to submit claims for payment to DOL.

272.    On August 17, 2015, DSP entered into an "MSO Services Agreement" with an entity called Vintage Grow Investment Partners I, LLC.  Vintage Grow Investment Partners I, LLC consisted of five partners:  (1) Kevin Kuykendall; (2) Mark Schneider; (3) Michael Schneider; (4) Trenton Moody; and (5) Steve Solomon.

273.     Kevin Kuykendall, Mark and Michael Schneider, and Trenton Moody were all owners of Medoc.  Steve Solomon had recently joined Medoc's management team.

274.    James Webb signed the agreement on behalf of DSP.  Kevin Kuykendall signed on behalf of Vintage Grow.

275.    According to the agreement, Vintage Grow would provide "certain management, administrative, and marketing services" to DSP.  According to the Texas Secretary of State database, Vintage Grow had not been incorporated at the time the agreement was signed.  It had no employees and could not provide services to DSP. Vintage Grow was a mere stand-in for Defendants Kevin Kuykendall, Sabrina Kuykendall, Trenton Moody, Mark Schneider, and Michael Schneider.

276.   In return for these "services," DSP would pay Vintage Grow service fees in the amount equal to 89% of Gross Operating Income, as shown below:

**EXHIBIT B**

**SERVICE FEES**

As compensation for all of the Services rendered by Company under this Agreement, Pharmacy shall pay to Company an amount equal to eight-nine percent (89%) of the Gross Operating Income.

277.   The service fees in the Vintage Grow agreement were in excess of fair market value.  One purpose—if not the only purpose—of the service fees in the Vintage Grow agreement was to reward Defendants for arranging federal referrals to DSP.  In essence, the Medoc Defendants created a scheme to do indirectly what they knew they could not do directly, namely, receive kickbacks.  The AKS specifically prohibits both direct and indirect kickbacks.

278.   On August 26, 2015, Kevin Kuykendall emailed Defendant Michael Nguyen: "Where do we stand re: Doctors pharmacy and moving the Federal scripts over?"  Nguyen responded that he and Coney would be going to DSP around lunch to teach them how to transfer scripts and adjudicate them through their current system.  Kuykendall replied: "Let me know how I can help."

279.   Even after the end of the Total RX sham employment agreement, Nguyen, Total RX, and Total RX employees continued to work with the Medoc Defendants to solicit and receive kickbacks from new pharmacies—like DSP—in return for kickbacks on federal program patient prescriptions.

**2.      From September 1, 2015 through the end of January 2016, the Medoc Defendants solicited and received kickbacks from DSP in return for federal referrals.**

280.    On September 1, 2015, Kevin Kuykendall informed Medoc's Vice President of Operations, Mika Bradford, that "all government pay prescriptions will be filled at Doctors Specialty pharmacy."

281.    The Medoc Defendants used their control of MSO physician prescriptions to change the pharmacy used to fulfill federal program patient prescriptions from Total RX to DSP on September 1, 2015.

282.    Before August 17, 2015, the volume of DSP's federal claims was modest. From January 1, 2015 through August 16, 2015, DSP only submitted approximately 100 claims to federal healthcare programs, and was only paid approximately $103,000 by Medicare, Tricare, and DOL combined on the basis of those claims.

283.    But during the existence of the Vintage Grow Agreement—i.e., from August 18, 2015 through January 31, 2016—DSP submitted almost 900 claims for payment to those same three federal programs, resulting in the payment of over $1.9 million to DSP.  That explosion in DSP's claims for payment was a direct result of the Medoc Defendants arranging for the referral of federal healthcare program patient prescriptions to DSP for fulfillment in return for receiving 89% of DSP's gross operating income on such prescriptions.  As a result of those kickback payments, each claim for payment that DSP submitted to a federal healthcare program on the basis of referrals from MSO physicians was false for purposes of the FCA.

284.   On October 8, 2015, Sabrina Kuykendall emailed Megan Wooten, a Preferred Accounting Assistant.  Sabrina wrote: "We thought there was at least $440k that came in from Medoc related scripts so far and the bank account is down below $343k and that doesn't reconcile for us yet."  Sabrina told Wooten that DSP should stop making payments from its bank account until Medoc could review DSP's financials.

285.   On October 13, 2015, Sabrina Kuykendall emailed Wooten and Richard Schriefer, Preferred's CFO, copying Kevin Kuykendall and Medoc employee Jill Rocha: "I understood that DSP has been running super cash tight or negative; therefore, the reason for the inquiries is that in one month Medoc drove $622k of gross revenue into DSP and from the looks of it…….the expenses have been a larger number than I had imagined" (ellipses in original).  Sabrina expressed concern that "from the looks of it, DSP has been paying for items that may be old A/P items or past due items out of the revenue that was generated by the Medoc doctors prescriptions?!!?"  Sabrina wrote that she and Rocha were getting questions "from the partners on our side," and "I need to make sure we have your/Rich/past DSP management's detailed explanation that no expenses or payments out of the account since Medoc was involved were for payments that are old or past due A/P simply because the money was in the bank."

286.   The "partners" that Sabrina Kuykendall referenced included Kevin Kuykendall, Trenton Moody, Mark Schneider, and Michael Schneider, who had agreed to split the kickback money routed through Vintage Grow for the arrangement of federal referrals from Medoc MSO physicians to DSP.

287.    On October 14, 2015, Schriefer "replied all" to Sabrina Kuykendall's email and said that DSP's bills paid for the months of September and October were for current expenses of the pharmacy.

288.    In these emails, Sabrina and Kevin Kuykendall demanded and received data regarding DSP's expenses to ensure that the kickbacks the Medoc Defendants had solicited from DSP were not artificially decreased by inflated costs or costs not associated with DSP's pharmaceutical business.

289.    On October 21, 2015, Sabrina Kuykendall emailed Kevin Kuykendall a revised version of Medoc's financial numbers for September.  She noted for one of the revisions "federal was around $22k and Medoc will get that money back."  While DSP had purportedly executed an agreement with Vintage Grow, Sabrina Kuykendall, Kevin Kuykendall, Trenton Moody, Mark Schneider, and Michael Schneider each understood that they would be the ones receiving the federal revenue generated by MSO physician prescriptions—and they agreed to split it through Vintage Grow.

### a.    August and September federal referrals to DSP, and the resulting kickbacks to the Medoc Defendants.

290.    Defendants Sabrina Kukyendall and Moky Cheung tracked the federal referrals that the Medoc Defendants directed to DSP for fulfillment on a monthly basis.

291.    On October 30, 2015, Sabrina Kuykendall emailed Rocha, copying Kevin Kuykendall, with "updated DSP" numbers, as shown below:

| | Copay | COGS | Gross Adjudications | Post Cost | Vintage Grow |
|---|---|---|---|---|---|
| August | $ - | $ 59,003.16 | $ 321,191.29 | $ 262,188.13 | $ 233,347.44 |
| September | $ - | $ 30,148.92 | $ 213,566.00 | $ 183,417.08 | $ 163,241.20 |

292.    In Sabrina's email, the "Vintage Grow" column equals 89% of the "post cost" adjudications at DSP—matching the terms of the agreement between Vintage Grow and DSP.

293.    On November 4, 2015, Sabrina Kuykendall emailed Kevin Kuykendall and Steve Solomon a "DSP P&L for August and September." It showed a $218,211.46 distribution to Vintage Grow, representing a portion of the kickback paid to the Medoc Defendants, through Vintage Grow, for arranging federal referrals to DSP in August and September 2015 (excerpted below):

| Gross Operating Income | $ 157,843.91 | $ 72,627.51 | | |
| --- | --- | --- | --- | --- |
| **Entity** | **August** | **September** | **Adjustments (b)** | **Distribution** |
| Vintage Grow Investments I, LLC  89% | 140,481.08 | 64,638.48 | 13,091.90 | $ 218,211.46 |

294.    From August 18, 2015 (the day after the Vintage Grow Agreement was executed) through September 30, 2015, the Medoc Defendants arranged for the referral of numerous federal program patient prescriptions from MSO physicians to DSP.  DSP submitted claims to federal healthcare programs on the basis of these prescriptions.  Each of these claims was false because they were tainted by kickbacks that the Medoc Defendants extracted from DSP, through the Vintage Grow Agreement.  Those kickbacks were meant to and did reward and induce the federal program patient referrals.  Many, if not all, of these prescriptions are included in Medoc tracking spreadsheets identifying referrals arranged by the Medoc Defendants to DSP.

295.    On or around June 22, 2015, Medoc MSO physician Dr. Lorraine Rudder wrote prescriptions for patient J.V., a DOL beneficiary.  While the sham Michael

Schneider employment agreement was in place at Total RX, the Medoc Defendants directed J.V.'s prescriptions to Total RX for fulfillment.  But after the Vintage Grow agreement was in place, the Medoc Defendants routed J.V.'s prescriptions to DSP for fulfillment.

296.    On August 31, 2015, DSP submitted claims for payment for MS-49, MS-59, NCP-7 (Stera-Base), and a Sinelee Pad 0.05-5% to DOL on the basis of J.V.'s prescriptions.  DOL paid $22,206.20 to DSP on the basis of these claims.

297.    The claims DSP submitted to DOL on the basis of J.V.'s prescriptions were included in a Medoc tracking spreadsheet identifying federal referrals arranged by the Medoc Defendants to DSP, as shown below:

| Date | Rx Number | Quan. | Drug | NDC | Doctor First Name | Doctor Last Name |
|------|-----------|-------|------|-----|-------------------|------------------|
| 08/31/2015 | 600070 | 60 | MS-49 | 99999-9998-57 | LORRAINE | RUDDER |
| 08/31/2015 | 600071 | 60 | MS-59 | 99999-9998-38 | LORRAINE | RUDDER |
| 08/31/2015 | 600072 | 300 | NCP-7 (STERA-BASE) | 99999-9999-03 | LORRAINE | RUDDER |
| 08/31/2015 | 600073 | 60 | SINELEE PAD 0.05-5% | 69263-0021-15 | LORRAINE | RUDDER |

298.    J.V. started receiving these pain creams and patches in the mail.  She had not discussed them with Dr. Rudder.  She received so many packages in the mail that she called the pharmacy and requested that they stop sending her pain creams.  J.V. had to call the pharmacy several times before the packages finally stopped.

299.    Based on its control of MSO physician prescriptions, the Medoc Defendants directed J.V.'s prescriptions to both Total RX and DSP for fulfillment, depending on which scheme they were operating at the time.  As such, between June and December 2015, DOL paid approximately $80,437 to both Total RX and DSP combined

for claims based on J.V.'s prescriptions. These were all false claims tainted by their respective kickback agreements.

300. On or around April 21, 2015, Medoc MSO physician Dr. Nicholas Iagulli wrote prescriptions for patient R.V., a DOL beneficiary. While the sham Michael Schneider employment agreement was in place at Total RX, the Medoc Defendants directed R.V.'s prescriptions to Total RX for fulfillment. But after the Vintage Grow agreement was in place, the Medoc Defendants directed R.V.'s prescriptions to DSP.

301. On or around September 30, 2015, DSP submitted claims for payment for MS-82, SRC1, NCP-7 (Stera-Base), and a Sinelee Pad 0.05-5% to DOL on the basis of R.V.'s prescriptions. DSP was paid $18,497.24 by DOL for these claims.

302. The claims DSP submitted to DOL on the basis of R.V.'s prescriptions were included in a Medoc tracking spreadsheet identifying federal referrals arranged by the Medoc Defendants to DSP, as shown below:

| Date | Rx Number | Quan. | Drug | NDC | Doctor First Name | Doctor Last Name |
|---|---|---|---|---|---|---|
| 09/30/2015 | 600069 | 60 | MS-82 | 99999-9999-24 | NICHOLAS | IAGULLI |
| 09/30/2015 | 600068 | 120 | SRC1 | 99999-9998-47 | NICHOLAS | IAGULLI |
| 09/30/2015 | 600067 | 60 | SINELEE PAD 0.05-5% | 63263-0021-15 | NICHOLAS | IAGULLI |
| 09/30/2015 | 600066 | 300 | NCP-7 (STERA-BASE) | 99999-9999-03 | NICHOLAS | IAGULLI |

303. Each of these claims for payment to DOL were false because they were tainted by kickbacks the Medoc Defendants solicited and received from DSP to reward and induce federal program patient referrals.

304. Like other Medoc patients, R.V. also started receiving packages with various pain creams in the mail. After receiving multiple shipments filled with creams and lotions, R.V. called the pharmacy and told them to stop sending them. The person

responded that R.V. had to be sent the medication because the doctor prescribed it.  R.V. got so many packages of pain creams they needed to be stored in the garage.

305.    Based on its control of MSO physician prescriptions, the Medoc Defendants directed R.V.'s prescriptions to both Total RX and DSP for fulfillment, depending on which scheme they were operating at the time.  As such, between April and December 2015, DOL paid approximately $164,859 to Total RX and DSP combined for claims based on R.V.'s prescriptions.  These were all false claims tainted by their respective kickback agreements.

**b.    October, November, and December referrals, resulting in December/January kickbacks.**

306.    On December 30, 2015, Sabrina Kuykendall emailed Jill Rocha, copying Kevin Kuykendall, about "DSP numbers for Oct, Nov, Dec":

## DSP numbers for Oct, Nov, Dec

| | |
|---|---|
| From: | Sabrina Kuykendall <sabrinak@medoc-llc.com> |
| To: | Jill Rocha <jillr@medoc-llc.com> |
| Cc: | Kevin Kuykendall <kevink@medoc-llc.com> |
| Date: | Wed, 30 Dec 2015 12:59:59 -0600 |
| Attachments: | PL - DSP - Oct, Nov, Dec.xlsx (16.92 kB) |

Jill-

Please see the attached P&L numbers for Doctor's Specialty Pharmacy. This is for October, November and December. These are based on the reports from Moky/Chris for compounding and looking at the Quickbooks files.

307.    The "Moky" referenced in Sabrina's email is Defendant Moky Cheung, who assisted in the calculation of kickbacks due to Vintage Grow from DSP.

308.    In her December 30 email, Sabrina asked Rocha to "please send me the final P&Ls based on your review of what I've done."  Sabrina added "the guys are wanting to cut checks and transfer money to Vintage Grow today so that it makes by end of the year."  Sabrina is referring to Defendants Kevin Kuykendall, Trenton Moody, Mark Schneider, and Michael Schneider, along with Steve Solomon.

309.    The attachment to Sabrina Kuykendall's email showed a $555,491.59 distribution to Vintage Grow Investments I, LLC:

| Gross Operating Income | $ 176,856.77 | $ 204,820.16 | $ 229,675.58 | | |
|---|---|---|---|---|---|
| **Entity** | **October** | **November** | **December** | **Adjustments (b)** | **Distribution** |
| Vintage Grow Investments I, LLC  89% | 157,402.53 | 182,289.95 | 204,411.26 | 11,387.85 | $ 555,491.59 |

310.    As detailed in the chart excerpted above and attached to Sabrina Kuykendall's December 30, 2015 email, Sabrina Kuykendall solicited kickbacks in the amount of $555,491.49 from DSP to Vintage Grow—that is, Kevin Kuykendall, Mark Schneider, Michael Schneider, Trenton Moody, and Steve Solomon—to reward the arrangement of federal referrals that the Medoc Defendants directed to DSP for fulfillment in October, November, and December of 2015.

311.    The $555,491.59 was an inducement and reward from DSP to Defendants Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider in return for arranging for the referral of federal healthcare program patient prescriptions to DSP for fulfillment in October, November, and December of 2015, and into the future.

312.    During October, November, and December of 2015, the Medoc Defendants arranged for the referral of numerous federal healthcare program patient prescriptions

from MSO physicians to DSP.  DSP submitted claims to federal healthcare programs on the basis of these prescriptions.  Each of these claims was false because they were tainted by kickbacks that the Medoc Defendants extracted from DSP, through the Vintage Grow Agreement.  Those kickbacks were meant to and did reward and induce the federal program patient referrals.  Many, if not all, of these prescriptions are included in Medoc tracking spreadsheets identifying referrals arranged by the Medoc Defendants to DSP.  Examples of federal program patient prescriptions referred by the Medoc Defendants to DSP during this time period include the following:

- On or around July 13, 2015, Medoc MSO physician Dr. Lorraine Rudder wrote prescriptions for patient H.L., a DOL beneficiary.  While the sham Michael Schneider employment agreement was in place, the Medoc Defendants directed H.L.'s prescriptions to Total RX for fulfillment.  But after the Vintage Grow agreement was executed, the Medoc Defendants directed H.L.'s prescriptions to DSP for fulfillment.  On or around October 29, 2015, DSP submitted claims for payment for MS-59, MS-49, NCP-7 (Stera-Base), and a Sinelee Pad 0.05-5% to DOL on the basis of H.L.'s prescriptions.  DOL paid $22,206.20 to DSP on these claims.

- On or around October 16, 2015, Medoc MSO physician Dr. Thomas Eric Hansen wrote prescriptions for patient L.D., a Medicare Part D beneficiary.  On or around October 22, 2015, DSP submitted claims for payment for Lidocaine and Diclofenac Sodium to Medicare Part D on the basis of L.D.'s prescriptions.  Medicare Part D paid $446.03 and $897.46, respectively, to DSP on these claims.

- On or around September 2, 2015, Medoc MSO physician Dr. Paul Marciano wrote a prescription for patient S.C., a Tricare beneficiary.  On or around October 23, 2015, DSP submitted a claim for payment for Diclofenac Sodium Gel to Tricare on the basis of S.C.'s prescription.  Tricare paid $1,187.86 to DSP for the claim.

- On or around October 21, 2015, Medoc MSO physician Dr. Gary Lawton wrote prescriptions for patient W.L., a Tricare beneficiary.  On or around October 26, 2015, DSP submitted claims for payment for Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, and Durachol 3 to Tricare on the

basis of W.L.'s prescriptions.  Tricare paid $869.39, $1,187.86, and $547.57, respectively, to DSP for these claims.

- On or around October 30, 2015, Medoc MSO physician Dr. Gary Lawton wrote prescriptions for patient K.M., a Tricare beneficiary.  On or around November 2, 2015, DSP submitted claims for payment for Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, Hydrocort-Pramoxine cream, and Durachol 3 to Tricare on the basis of K.M.'s prescriptions. Tricare paid $3,884.67 to DSP on these claims.

- On or around November 16, 2015, Medoc MSO physician Dr. Gurpreet Bajaj wrote prescriptions for patient S.D.A., a Medicare Part D beneficiary. On or around November 18, 2015, DSP submitted claims for payment for Lidocaine ointment and Fluocinonide cream to Medicare Part D on the basis of S.D.A.'s prescriptions.  Medicare Part D paid $1,712.29 and $2,475.64, respectively, to DSP on these claims.

- On or around July 29, 2015—the same day Sabrina Kuykendall emailed the Barolo partners "we will no longer be receiving Federal funds through Total RX"—Medoc MSO physician Dr. Greg Amelung wrote prescriptions for patient D.M., a Tricare beneficiary.  The Medoc Defendants did not direct D.M.'s prescriptions to Total RX, and instead sent them to DSP after the Vintage Grow agreement was executed.  On or around October 14, 2015, DSP submitted claims for payment for Lidocaine 5% Ointment and Diclofenac Sodium gel to Tricare on the basis of D.M.'s prescriptions. Tricare paid $949.34 and $1,187.86, respectively, to DSP for the claims. On or around November 11, 2015, DSP submitted additional claims for payment for the same drugs to Tricare on the basis of D.M.'s prescriptions. Tricare paid another $869.39 and $1,187.86, respectively, to DSP for the claims.

- On or around August 31, 2015, Medoc MSO physician Dr. Lorraine Rudder wrote prescriptions for patient I.M., a DOL beneficiary.  On or around November 25, 2015, DSP submitted claims for payment for MS-59, MS-49, and NCP-7 (Stera-Base) to DOL on the basis of I.M.'s prescriptions.  DOL paid $20,274.90 to DSP for these claims.

- On or around December 7, 2015, Medoc MSO physician Dr. Kendall Carll wrote prescriptions for patient J.F., a Tricare beneficiary.  On or around December 10, 2015, DSP submitted claims for payment for Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, and Fluocinonide 0.1% Cream to Tricare on the basis of J.F.'s prescriptions.  Tricare paid $869.39, $1,187.86, and $1,313.59, respectively, to DSP for these claims.

- On or around December 8, 2015, Medoc MSO physician Dr. Clifford Deprang wrote prescriptions for patient B.R., a DOL beneficiary. On or around December 10, 2015, DSP submitted claims for payment for MS-49, MS-60, NCP-7 (Stera-Base), and a Synvexia Pad 4-1% to DOL on the basis of B.R.'s prescriptions. DOL paid $24,408.84 to DSP for these claims.

- On or around December 23, 2015, Medoc MSO physician Dr. Kendall Carll wrote prescriptions for patient E.B., a Medicare Part D beneficiary. On or around December 29, 2015, DSP submitted claims for payment for for Lidocaine and Diclofenac Sodium gel to Medicare Part D on the basis of E.B.'s prescriptions. Medicare Part D paid $600.32 and $892.02, respectively, to DSP for these claims.

313.   The prescriptions, claims for payment, and payments to DSP identified in the preceding paragraph merely represent a few examples of federal program patient prescriptions that the Medoc Defendants directed to DSP in October, November, and December of 2015.

314.   Each of the claims DSP submitted in connection with the above-referenced examples—and every other claim submitted by DSP to federal healthcare programs based on MSO physician prescriptions directed to DSP by the Medoc Defendants in October, November, and December of 2015—are false because they are tainted by the kickbacks from DSP to the Medoc Defendants through the Vintage Grow agreement.

315.   The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by soliciting and receiving kickbacks from DSP on the basis of federal program patient prescriptions through the sham, above fair market value Vintage Grow agreement.

### c.     Final kickback payments from DSP to the Medoc Defendants under the Vintage Grow Agreement.

316.    On January 6, 2016, Sabrina Kuykendall emailed Moky Cheung and asked him to "run the DSP report for August through December (separately by month) so I can review." Cheung sent Kuykendall tracking spreadsheets showing referrals that the Medoc Defendants had arranged to DSP.

317.    On January 22, 2016, Sabrina Kuykendall emailed Webb, Schriefer, Kevin Kuykendall, and Rocha an "August 2015 through December 2015 financial summary for Doctors Specialty Pharmacy." Sabrina noted that the numbers had decreased as "a result of adjustments made to October and December." The attachment showed a $530,406 distribution to Vintage Grow Investments I, LLC for the months of October, November, and December 2015 from DSP:

| Gross Operating Income | | $ 157,844 | $ 67,628 | | $ 135,603 | $ 220,336 | $ 235,757 | | |
|---|---|---|---|---|---|---|---|---|---|
| Entity | | August | September | Aug / Sept Adjustments | October | November | December | Q4 Adjustments | Distribution (d) |
| Vintage Grow Investments I, LLC | 89% | 140,481 | 60,188 | 8,092 | 120,687 | 196,099 | 209,824 | 3,796 | $ 530,406 |

318.    In the January 22, 2016 financial numbers excerpted above, the payments from DSP to Vintage Grow for August through December 2015, including adjustments, equal $739,167.

319.    As show below, Vintage Grow's P&L statement reports $739,167.46 in total income—i.e., kickbacks—for the fourth quarter of 2015. The purpose of these kickbacks was to reward the Medoc Defendants for arranging referrals of federal healthcare program patients to DSP from August through December 2015, and into the future.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **12:51 PM** | | | | | | | | |
| **04/15/17** | | | | | | | | |
| **Accrual Basis** | | | | | | | | |
| | Jan - Mar 15 | Apr - Jun 15 | Jul - Sep 15 | Oct - Dec 15 | Jan - Mar 16 | Apr - Jun 16 | Jul - Sep 16 | Oct - Dec 16 | TOTAL |
| **Ordinary Income/Expense** | | | | | | | | |
| Income | | | | | | | | |
| 48100 · Net Profits Revenue | 0.00 | 0.00 | 0.00 | 739,167.46 | 0.00 | 0.00 | 0.00 | 0.00 | 739,167.46 |
| 48115 · Allocation of Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Income** | 0.00 | 0.00 | 0.00 | 739,167.46 | 0.00 | 0.00 | 0.00 | 0.00 | 739,167.46 |
| **Expense** | | | | | | | | |
| 68500 · Legal Fees | 0.00 | 0.00 | 0.00 | 6,925.00 | 2,052.00 | 0.00 | 0.00 | 0.00 | 8,977.00 |
| 68601 · Miscellaneous Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Expense** | 0.00 | 0.00 | 0.00 | 6,925.00 | 2,052.00 | 0.00 | 0.00 | 0.00 | 8,977.00 |
| **Net Ordinary Income** | 0.00 | 0.00 | 0.00 | 732,242.46 | -2,052.00 | 0.00 | 0.00 | 0.00 | 730,190.46 |
| **Net Income** | 0.00 | 0.00 | 0.00 | 732,242.46 | -2,052.00 | 0.00 | 0.00 | 0.00 | 730,190.46 |

Vintage Grow Partners Investments I LLC
Profit & Loss
January 2015 through December 2016

320.    During 2015, Vintage Grow Partners Investments I, LLC was a subsidiary entity of Vintage Grow Partners, LP.

321.    According to Schedule K-1s filed by Vintage Grow Partners, LP, Vintage Grow Partners reported the following amounts in ordinary business income for 2015:

- $121,130 to Kevin and Sabrina Kuykendall through K&S Biotherapeutics, LLC;
- $121,131 to Steve Solomon through SDML Capital, LP;
- $121,130 to Mark Schneider through MCS Interests, LP;
- $121,131 to Michael Schneider through Shemiyah Holdings, LP
- $121,130 to Trenton Moody through Performance Biomedical, LLC.

### d.    The end of the Vintage Grow Agreement.

322.    On Thursday, January 28, 2016, Medoc hosted an MSO dinner at La Cima Club in Irving, Texas.  MSO physician-investors were invited to attend the dinner.  Kevin Kuykendall attended the dinner.

323.    At the La Cima dinner, MSO physician-investors raised concerns to Kevin Kuykendall and other members of Medoc's management team regarding referrals for federal program patients, and in particular, the pharmacy Medoc used to fulfill the federal prescriptions written by MSO physicians.

324.    Shortly thereafter, the Medoc Defendants stopped the Vintage Grow agreement at the end of January 2016.

325.    According to Vintage Grow Investment Partners I, LLC's balance sheet, in February 2016, Vintage Grow Investment Partners I made $175,000 distributions to each of the five partners: Kevin Kuykendall, Mark Schneider, Michael Schneider, Steve Solomon, and Trenton Moody.

326.    While the Vintage Grow Agreement was in effect, DSP's volume of paid Medicare, Tricare, and DOL claims skyrocketed, growing from approximately $103,000 in the first seven and a half months of 2015 to in excess of $1.9 million dollars from mid-August 2015 through January 2016.  After the agreement ended, DSP's claims for payment to federal healthcare programs plummeted.  The chart below illustrates the trend in DSP's federal reimbursements before, during, and after the Vintage Grow agreement using Medicare, Tricare, and DOL paid claims.  The months during which the Vintage Grow agreement was in effect are in red:



327.    All told, from August 2015 through January 2016, the Medoc Defendants arranged for the referral of prescriptions for hundreds of federal healthcare program patients generated by MSO physicians to DSP, each of which was tainted by the kickbacks the Medoc Defendants solicited and received from DSP.

328.    On the basis of those patients, DSP submitted approximately 900 kickback-tainted claims to federal government healthcare programs, resulting in Medicare, Tricare, and DOL paying approximately $1.9 million for those false claims.

**C.    The Midcities Sham Employment Agreement (February 2016 through August 2016).**

329.    Aemad Aslam is a licensed pharmacist.

330.    In November 2013, Aemad Aslam opened his own retail pharmacy.  Aslam named his pharmacy Midcities Pharmacy (MCP).

331.    In 2015, Aslam met Mark Schneider.  Schneider told Aslam that he was in the pharmacy business and asked about MCP's insurance contracts.  Schneider learned

that MCP had a grandfathered Caremark contract that reimbursed for compound prescriptions.

332.   At the time Mark Schneider introduced himself to Aslam, the Medoc Defendants were operating the Total RX sham employment agreement and directing MSO physician prescriptions to Total RX for fulfillment.  But Total RX did not have a Caremark contract that reimbursed for compound prescriptions.

333.   Mark Schneider told Aslam that Aslam, MCP, and the Medoc Defendants could make millions of dollars together.  Schneider invited Aslam to visit Total RX, where Aslam met Michael Nguyen, Andrew Coney, and Kevin Kuykendall.

334.   In 2015, Aslam agreed to pay Medoc for prescriptions that Medoc sent to MCP.  Medoc had been holding these prescriptions because Total RX did not have a Caremark contract that would reimburse for compounds.

335.   Caremark audited the Medoc prescriptions after Aslam began processing them.  Aslam told Nguyen and Coney that the prescriptions were being audited, and that he would not pay Medoc for the referrals.

336.   Aslam ended his initial relationship with Medoc in 2015.

337.   On February 3, 2016—just days after the MSO dinner at La Cima referenced above—Renee Dougalas emailed Andrew Coney, Brandon Hendrickson, Kevin Kuykendall, Jim Campbell (Medoc's Chief Operating Officer), and Steve Solomon about where to send federal prescriptions generated by Medoc's MSO physicians for fulfillment.  Coney suggested sending them to Aslam and MCP.  Kuykendall responded: "I'm fine with that.  Tell him to call me and we can get an agreement in place tomorrow."

338.    That same day, Dougalas emailed the same group the following about federal prescriptions:  "We have approx 130 prescriptions with an average 2 rx's on each = 260.  Taking the 260 with possible TI conversion = 390 prescriptions.  Then add in 15 Federal work comp since Monday = $180,000.  That aside it's 145 unhappy patients."

339.    On February 3, 2016, Hendrickson replied to Dougalas, Coney, Kevin Kuykendall, Steve Solomon, and Jim Campbell, adding Moky Cheung to the exchange: "I'll let Kevin weigh in on sending the federal scripts."

340.    Kuykendall emailed Dougalas asking: "How do we know all those files are federal?"  Dougalas responded: "Several ways copy of insurance cards, emdeon, and insurance benefit verification."

341.    The next day, February 4, 2016, Moky Cheung approached Aslam about renewing MCP's business relationship with the Medoc Defendants.  Cheung said that the Medoc Defendants would direct federal healthcare program prescriptions to MCP for fulfillment if, in return, MCP agreed to hire Michael Schneider as a W2 employee.  And just as with the Total RX Defendants, Michael Schneider's "wages" would be based on the revenue generated by those federal healthcare program patient prescriptions sent to MCP by the Medoc Defendants.

342.    Aslam agreed.  On February 4, 2016, Cheung sent Aslam an employment agreement and a copy of Michael Schneider's passport.  Schneider was not included on the emails.

343.    On February 5, 2016, Aslam and Michael Schneider executed an "Employment Agreement" that was backdated to February 1, 2016.  According to the

contract, Schneider's direct supervisor was Aslam, MCP's CEO.  Similar to the Total RX

sham employment agreement, the contract provided that MCP would pay Schneider a

$2,500 monthly draw, plus commissions calculated as follows:

II.     Commission Compensation

Commissions payable to Employee shall be calculated based on Net Adjudications
(Gross Adjudication less Cost of Goods Sold) per month for the provider group.
Company will pay Employee fifty percent (50%) of Net Adjudications on the 15th of
every month for the previous month's sales.

344.    After the Schneider-MCP Agreement was executed, the Medoc Defendants

arranged for the referral of federal healthcare program patient prescriptions from MSO

physicians to MCP for fulfillment.

345.    On February 5, 2016, Cheung emailed Renee Dougalas, Aslam, and Coney:

"I have cc'ed Aemad from MidCities Pharmacy.  We will be sending all the Federal to

them for now."

346.    The Medoc Defendants used their control of the federal program

prescriptions generated by MSO physicians to solicit and receive kickbacks from yet

another pharmacy (this time, MCP) on the basis of federal referrals.  They also used their

control of MSO physician prescriptions to change the pharmacy used to fulfill federal

referrals from MSO physicians from DSP to MCP in a matter of days when they needed

to adjust their kickback scheme.

347.    On February 9, 2016, Aslam emailed Moky Cheung and Hendrickson: "I

think there was some miscommunication.  When I first spoke, I thought we were getting

around 100 scripts *a week*.  Till now, we have over 250 patients, each with multiple

scripts.  With my lead tech out (I had mentioned it), I don't have the capacity to type and adjudicate these in a timely manner."  Aslam asked Medoc to cut back on incoming scripts.

348.   Cheung forwarded Aslam's February 9 email to Kevin Kuykendall: "Just an FYI, we may need to find a Federal plan B if Aemad can't handle the volume."

349.   On February 15, 2016, Jim Campbell spoke with Aslam about the volume of prescriptions routed to Midcities.  Campbell emailed Cheung and Hendrickson, copying Kevin Kuykendall and Medoc executive Justin Mourning: "Just got off the phone with Aemad who is raising a white flag.  Can you send me the document(s) / spreadsheet(s) that Aemad is sending you daily."

350.   On February 17, 2016, Campbell emailed Kevin Kuykendall about the Midcities volume:

## Mid-Cities

| | |
|---|---|
| From: | Jim Campbell <jimc@medoc-llc.com> |
| To: | Kevin Kuykendall <kevink@medoc-llc.com>, Nick Basiti <nickb@medoc-llc.com> |
| Date: | Wed, 17 Feb 2016 16:00:14 -0600 |

Just got off the phone with Aemad Aslam. I thought it might be an adjudication process issue. It's not. He is asking that we limit the number of scripts to 100 per week as soon as possible. We are currently feeding him 50 to 75 per day. We should start making ready another WinRx box for another pharmacy.

351.   On February 25, 2016, Aslam emailed Campbell and Cheung: "We are being audited by BCBS and undergoing a Catamaran / United Healthcare audit.  As you know, they are intrusive and time consuming."  Aslam again asked Medoc reduce the

number of prescriptions it was sending to MCP because MCP could not handle the

volume.

352.    That same day, Campbell forwarded Aslam's email to Kevin Kuykendall

and Mark Schneider: "Checking in to see what the status is identifying another pharmacy.

Thanks."

353.    On March 4, 2016, Aslam emailed Campbell and Cheung: "We are

approaching a high number of prescriptions that we are mailing out.  In addition, we are

being periodically audited on various scripts.  Are you splitting any prescriptions with

other pharmacies yet?  I want to be sure that we are going to be under audit thresholds."

354.    That same day, Campbell forwarded Aslam's email about audit thresholds

and splitting prescriptions to Mark Schneider, copying Kevin Kuykendall and Eric

Nelsen, Medoc's Vice President of Pharmacy Operations.

355.    The Medoc Defendants tried to arrange—i.e., direct—referrals so as to stay

"under the radar" with insurance companies.  In one email in May 2016, for example,

Moky Cheung emailed Kevin Kuykendall, Campbell, Nelsen, and Medoc executive

Justin Mourning that they were making changes to script pads "so we can stay more

'under the radar' when processing these claims" (quotes in original).

356.    After executing the sham employee agreement with MCP, Michael

Schneider did not perform any of the tasks in the agreement or provide services to MCP.

Schneider also did not actually go to the pharmacy.  And so initially, Aslam refused to

pay Schneider.  But in or around April 2016, Michael Schneider began to go to MCP to

demand money for the federal referrals that the Medoc Defendants were sending to MCP.

357.     As a result, Aslam began paying Michael Schneider kickbacks under this second sham employment agreement as a reward and inducement to the Medoc Defendants for directing federal program patient prescriptions to MCP.[2]

358.     Between April 22, 2016 and August 26, 2016, MCP paid $53,567.44 to Michael Schneider as shown below in MCP's payroll report:

| Schneider, Michael | 52 | | Soc. Sec. No. | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/22/2016 | 35276 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 5/6/2016 | 35279 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 5/20/2016 | 35282 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 6/3/2016 | 35285 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 6/17/2016 | 35287 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 7/1/2016 | 35291 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 7/15/2016 | 35292 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 8/12/2016 | 35297 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1868.10 |
| 8/26/2016 | 35300 | 2500.00 | 0.00 | 0.00 | 0.00 | 440.65 | 155.00 | 36.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19426.93 |
| Current Period | | 53567.44 | 0.00 | 0.00 | 0.00 | 15097.80 | 3321.18 | 776.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34371.73 |
| Current Quarter | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Year to Date | | 53567.44 | 0.00 | 0.00 | 0.00 | 15097.80 | 3321.18 | 776.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34371.73 |

359.     The payments shown above were kickbacks to the Medoc Defendants— routed through Michael Schneider under this second sham employment agreement—as a recompense for arranging federal referrals to MCP.

360.     MCP issued checks to Michael Schneider.  At first MCP mailed the kickback checks to Schneider.  But the checks went to the wrong address.  This prompted Aslam to email Moky Cheung—not Schneider—in June 2016 asking why Schneider was not depositing the checks.  Aslam asked Cheung to send the contact info for Aslam's so-called "employee."

---

[2] On July 11, 2019, Aemad Aslam and MCP executed a settlement agreement with the Department of Justice, on behalf of the United States Department of Health and Human Services, the Defense Health Agency, and the Department of Labor.  As such, neither Aslam nor MCP is named as a Defendant in this action.

361.    Cheung replied asking Aslam for "a report of all the claims and the amount to Michael S."  Cheung did not copy the purported employee on the communication. Instead he included Sabrina Kuykendall.

362.    Cheung forwarded Aslam's question about Schneider's checks to Sabrina Kuykendall, Kevin Kuykendall, and Michael Schneider on June 6, 2016.  Sabrina responded in frustration asking "How much activity did we run through there?  What is our deal with them?"

363.    As she did with the Total RX scheme, Sabrina Kuykendall furthered the Medoc Defendants' agreement to split kickbacks on federal referrals by calculating the kickback amounts due pursuant to the sham employment agreement.

364.    On June 19, 2016, Eric Nelsen (Medoc's Vice President of Pharmacy Operations) emailed Aslam: "Can you send me a sample of what you send as supporting documents for payment to Medoc?"

365.    On July 6, 2016, Nelsen emailed Aslam: "I will need all supporting documents for back up with regards to all claims you have processed for Medoc.  I will need it by noon for our CFO."

366.    On July 7, 2016, Aslam responded to Nelsen's request for documents and attached a file.  Nelsen then forwarded the info to David Engelberg (Medoc's CFO), copying Kevin Kuykendall: "I've attached the paid report from Aemad.  I do not see where he calculates what he owes us nor do I know if he has ever paid us.  I've attached the agreement as well."

367.    On July 7, 2016, Kevin Kuykendall emailed Nelsen asking for the password to access the supporting documentation for the referrals that Medoc arranged to MCP.

368.    On July 8, 2016, Moky Cheung again requested that Aslam send information regarding the federal referrals arranged by the Medoc Defendants to MCP. Cheung copied Eric Nelsen and Sabrina Kuykendall on the email.  Cheung and Kuykendall wanted the information to calculate the kickback amount that Aslam had agreed to pay in the MCP sham employment agreement.

369.    Aslam said he would send the requested information to Cheung.  Again, the purported employee was not included on the communication between Aslam, Cheung, and Sabrina Kuykendall.

370.    On July 8, 2016, Sabrina Kuykendall emailed Michael Schneider, Kevin Kuykendall, Engelberg, and Nelsen about the MCP checks.  Sabrina stated that MCP had not provided Medoc the backup data so Medoc's management could check the numbers—as they had done with the referrals arranged to Total RX and DSP.

371.    On July 20, 2016, Sabrina Kuykendall forwarded Aslam's email to both Mark Schneider and Michael Schneider.  Sabrina also informed Mark Schneider, Michael Schneider, Kevin Kuykendall, and Moky Cheung that Aslam was making the process difficult.

372.    Using information provided by Aslam and MCP, Sabrina Kuykendall calculated $53,567.44 in kickbacks due to the purported employee at will.  This

$53,567.44 kickback was to reward the Medoc Defendants for the arrangement of federal referrals from the MSO physicians to MCP from February through June 2016.

373.   Sabrina Kuykendall communicated the kickback amount to Mark Schneider, Michael Schneider, Kevin Kuykendall, and Moky Cheung.

374.   At this point the Medoc Defendants had closed the Barolo account.  So Sabrina Kuykendall also communicated the kickback amount to Engelberg, Medoc's CFO, indicating that the Medoc Defendants planned to divide the kickbacks through Medoc—thereby doing indirectly what they knew they could not do directly, i.e. solicit and receive kickbacks for the arrangement of federal referrals to MCP.

375.   By then the so-called "employee" had his own concerns about the sham employment agreement.  On July 21, 2016, Michael Schneider told Aslam he did not want to deposit his checks.  He asked Aslam whether the payments could be made to a company (e.g., Medoc) rather than to Schneider personally.  Schneider knew his purported "salary" was actually a kickback to the Medoc Defendants.

376.   After Schneider raised the issue, Aslam asked his payroll processor if there was a way to revise the previous checks issued to Schneider:

---

**Michael Schneider**
1 message

**Midcities Pharmacy** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮                             Fri, Jul 22, 2016 at 12:37 PM
To: Marwan Tabbara ▮▮▮▮▮▮▮▮▮▮

Salam Marwan,

Michael Schneider came in yesterday and he wants me to resolve the full payment to him soon.  He said he is not going to deposit his checks but he wants us to change the contract so that we do it all to a company (as a company) instead of him as a w2.

Is there a way to reverse the previous checks?  Or should I tell him that for all future payments we can do it to a company?

Aemad

---

377.    On July 24, 2016, Aslam emailed Michael Schneider in response to Schneider's request that MCP re-issue the kickback checks to a company rather than to Schneider as a W2 employee: "My payroll processor is indicating that he will not be able to revise the previous checks issued as taxes were reported to the IRS as well as the state. In addition, they are from a previous quarter."

378.    In that same July 24 email, Aslam noted that the future payment would be larger than what had been already paid to Schneider, and they could look into whether the payment should go to another entity.  But MCP's payroll indicates that subsequent kickback payments went directly to Schneider.

379.    MCP's payroll records show that by August 12, 2016, MCP had paid $20,000 to Michael Schneider pursuant to the sham MCP employment agreement.  But the Medoc Defendants wanted the rest of the kickback money—$33,567.44 according to Sabrina Kuykendall's calculations.

380.    In furtherance of the Medoc Defendants' agreement to split kickbacks on federal referrals, Michael Schneider updated Kevin Kuykendall, Mark Schneider, and Trenton Moody on his efforts to get Aslam to pay the rest of the kickbacks on the federal referrals that the Medoc Defendants had directed to MCP.

381.    On August 23, 2016, Michael Schneider sent Aslam a release that terminated his sham employment agreement.  It stated that MCP owed Schneider $33,567.44.  Aslam requested time to review.

382.    Mark Schneider then went to MCP to follow up with Aslam.  Aslam sent back proposed corrections to Michael Schneider.

383.    On August 25, 2016, Michael Schneider sent Aslam a "Mutual Release and Waiver" that terminated the sham employment agreement.  That document stated that "Employee has earned Commissions in the amount of $53,567.44 during the period of February 1, 2016 to June 30, 2016."  It further stated that MCP owed Schneider $33,567.44 from those commissions, net of all employment taxes, and that MCP would pay the amount to Schneider in one lump sum payment.

384.    Schneider also told Kevin Kuykendall, Mark Schneider, and Trenton Moody that he was going to meet with Aslam and get Aslam to pay the rest of the commissions—i.e., kickbacks.  Both Trenton Moody and Kevin Kuykendall offered to help Schneider in his efforts to get the final kickback check from Aslam.

385.    On August 26, 2016, Michael Schneider emailed Aslam: "Give me a time on Monday that we can meet and I'll be there to pick up the check."  The $33,567.44 identified in the termination agreement matches the August 26, 2016 entry in MCP's payroll records excerpted earlier in this Complaint.

386.    After meeting with Aslam, Michael Schneider told Kevin Kuykendall, Trenton Moody, and Mark Schneider that he had gotten the final kickback check from MCP.  Kuykendall thanked Schneider for his efforts.

387.    Between February and June of 2016, the Medoc Defendants arranged for the referral of numerous federal healthcare program patient prescriptions from MSO physicians to MCP for fulfillment.  MCP submitted claims to federal healthcare programs on the basis of these prescriptions.  Each of these claims was false because they were tainted by kickbacks that the Medoc Defendants extracted from MCP through the second

sham employment agreement.  Those kickbacks were meant to and did reward and induce

the federal program patient referrals.  Examples of federal program patient prescriptions

arranged by the Medoc Defendants to MCP during this time period include the following:

- On or around February 3, 2016, Medoc MSO physician Dr. Christopher Werner wrote a prescription for patient K.M., a Tricare beneficiary.  MCP submitted a claim for payment for Diclofenac 1.5% Topical Solution to Tricare on the basis of K.M.'s prescriptions.  Tricare paid $2,211.50 paid to MCP on the basis of this claim.

- On or around February 10, 2016, Medoc MSO physician Dr. Von Evans wrote two prescriptions for patient M.E., a Medicare Part D beneficiary.  On February 10, 2016, MCP submitted claims for payment for Diclofenac Sodium Solution 1.5% and Lidocaine Ointment 5% to Medicare Part D on the basis of M.E.'s prescriptions.  Medicare Part D paid $213.92 and $1,429.22, respectively, to MCP on these claims.

- On or around October 28, 2015, Medoc MSO physician Dr. Paul Marciano wrote two prescriptions for patient T.D., a Tricare beneficiary.  While the sham Vintage Grow agreement was in place, the Medoc Defendants directed T.D.'s prescriptions to DSP for fulfillment.  On October 29, 2015 and November 25, 2015, DSP submitted claims for payment to Tricare on the basis of T.D.'s prescriptions.  Tricare paid $2,926.64 to DSP for those claims.  After the Vintage Grow agreement ended, the Medoc Defendants directed T.D.'s prescriptions to MCP for fulfillment.  On or around March 21, 2016, MCP submitted claims for payment for Lidocaine 5% Ointment and Diclofenac Sodium 3% Gel to Tricare on the basis of T.D.'s prescriptions.  Tricare paid $819.21 and $787.32, respectively, to MCP on these claims.

- On or around February 15, 2016, Medoc MSO physician Dr. Nicholas Iagulli wrote prescriptions for J.H., a DOL beneficiary.  On or around February 15, 2016, MCP submitted three claims for payment to DOL on the basis of J.H.'s prescriptions.  DOL paid $5,064.49 to MCP on these claims.

- On or around March 22, 2016, Medoc MSO physician Dr. Jeffrey Ratusznik wrote two prescriptions for patient E.C., a Medicare Part D beneficiary.  On or about March 25, 2016, MCP submitted a claim for payment for Lidocaine 5% Ointment to Medicare Part D based on E.C.'s prescription.  Medicare Part D paid $1,609.41 to MCP on this claim.  On March 31, 2016, MCP submitted a claim for payment for Diclofenac

Sodium 1.5% Solution to Medicare Part D based on E.C.'s other prescription.  Medicare Part D paid $418.37 to MCP on this claim.

- On or around May 31, 2016, Medoc MSO physician Dr. Gary Lawton wrote three prescriptions for patient T.W., a Tricare beneficiary.  On or about May 31, 2016, MCP submitted claims for payment for Lidocaine 5% Ointment, Fluocinonide 0.1% cream, and Diclofenac 1.5% topical solution to Tricare based on T.W.'s prescription.  Tricare paid $1,233.68, $944.19, and $242.21, respectively, to MCP on these claims.

388.    The prescriptions, claims for payment, and payments to MCP identified in the preceding paragraph merely represent a few examples of federal program patient prescriptions that the Medoc Defendants directed to MCP between February and June of 2016.

389.    Each of the claims MCP submitted in connection with the above-referenced examples—and every other claim submitted by MCP to federal healthcare programs on the basis of MSO physician prescriptions that the Medoc Defendants directed to MCP from February through June 2016—are false because they are tainted by the kickback payments the Medoc Defendants extracted from MCP in return for arranging the referral of federal program patient prescriptions to MCP.

390.    The Medoc Defendants knowingly caused the submission of these kickback-tainted false claims by orchestrating the execution of another sham employment agreement, this time between Michael Schneider and MCP, to extract kickbacks from MCP on the basis of federal program patient prescriptions.

391.    During the time the Schneider-MCP Agreement was in effect, MCP's paid federal claims increased significantly.  The chart below shows MCP's paid claims from Medicare, Tricare, and Department of Labor before, during, and after the second sham

employment agreement.  The months during which the sham employment agreement was in effect are in red:



392.    All told, from February 2016 through the end of June 2016, the Medoc Defendants arranged for the referral of prescriptions for hundreds of federal healthcare program patients generated by MSO physicians to MCP, each of which was tainted by the kickbacks the Medoc Defendants solicited and received from MCP.

393.    On the basis of those patients, MCP submitted approximately 700 kickback-tainted claims to federal government healthcare programs, resulting in Medicare Part D, Tricare, and DOL paying over $600,000 for those false claims.

## FIRST CAUSE OF ACTION
Violations of the False Claims Act:
Causing the Submission of False Claims for Payment
31 U.S.C. § 3729(a)(1)(A)

394.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

395.    The United States seeks relief against Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider, for their violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

396.    As a result of Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider solicitation and acceptance of kickbacks to induce or reward the arrangement of federal referrals from MSO physicians to each of Total RX, DSP, and MCP in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), these Defendants caused the submission of thousands of false or fraudulent claims for payment to federal healthcare programs.

397.    Each claim that Total RX, DSP, or MCP submitted to a federal healthcare program on the basis of federal referrals arranged by Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider "constitute[d] a false or fraudulent claim for purposes" of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

398.    Each of Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider knowingly caused the submission of these false claims by soliciting and receiving kickbacks from Total RX, DSP, and MCP—and by using their control over MSO physician prescriptions to direct federal program patient prescriptions to Total RX, DSP, and MCP during the pendency of their various kickback schemes with those pharmacies.

399.    Compliance with the Anti-Kickback Statute was material to the Government's decision to pay the health care claims submitted by Total RX, DSP, and

MCP on the basis of federal healthcare program patients referred to those pharmacies by Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider.

400.    Defendants knowingly caused Total RX, DSP, and MCP to submit false or fraudulent claims for payment or approval to Medicare, Tricare, and Department of Labor programs in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

401.    Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider caused the submission of these false claims to federal healthcare programs with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

402.    By reason of these thousands of false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim that Defendants Medoc Health Services, LLC, Kevin Kuykendall, Sabrina Kuykendall, Mark Schneider, and Michael Schneider caused Total RX, DSP, and MCP to submit to federal healthcare programs.

## SECOND CAUSE OF ACTION
Violations of the False Claims Act:
Causing the Submission of False Claims for Payment
31 U.S.C. § 3729(a)(1)(A)

403.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

404.    The United States seeks relief against Defendant Moky Cheung for his violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

405.    As a result of Defendant Moky Cheung's solicitation and acceptance of kickbacks to induce or reward the arrangement of federal referrals from MSO physicians to each of Total RX and MCP in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), Defendant Moky Cheung caused the submission of thousands of false or fraudulent claims for payment to federal healthcare programs.

406.    Each claim that Total RX and MCP submitted to a federal healthcare program on the basis of federal referrals arranged by the Defendant Moky Cheung, along with the Medoc Defendants, "constitute[d] a false or fraudulent claim for purposes" of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

407.    Defendant Moky Cheung knowingly caused the submission of these false claims by soliciting and receiving kickbacks from Total RX and MCP—and by using Medoc's control over MSO physician prescriptions to direct federal program patient prescriptions to Total RX and MCP during the pendency of the respective kickback schemes with those pharmacies.

408.    Compliance with the Anti-Kickback Statute was material to the Government's decision to pay the health care claims submitted by Total RX and MCP on the basis of federal healthcare program patients referred to those pharmacies by the Medoc Defendants.

409.    Defendant Moky Cheung knowingly caused Total RX and MCP to submit false or fraudulent claims for payment or approval to Medicare, Tricare, and Department of Labor programs in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

410.    Defendant Moky Cheung caused the submission of these false claims to federal healthcare programs with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

411.    By reason of these thousands of false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim that Defendant Moky Cheung caused Total RX and MCP to submit to federal healthcare programs.

**THIRD CAUSE OF ACTION**
Violations of the False Claims Act:
Submitting False Claims for Payment
31 U.S.C. § 3729(a)(1)(A)

412.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

413.    The United States seeks relief against Defendants Michael Nguyen and Total RX for their violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

414.    As a result of Defendants Michael Nguyen and Total RX's payment of kickbacks to the Medoc Defendants to induce or reward the arrangement of federal referrals from MSO physicians to Total RX in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the Total RX Defendants knowingly submitted hundreds of false

or fraudulent claims for payment to federal healthcare programs.  Each claim that the

Total RX Defendants submitted based on their actions in violation of the Anti-Kickback

Statute "constitute[d] a false or fraudulent claim for purposes" of the False Claims Act.

42 U.S.C. § 1320a-7b(g).

415.    Compliance with the Anti-Kickback Statute was material to the

Government's decision to pay the health care claims submitted by Total RX.  The Total

RX Defendants knowingly submitted false or fraudulent claims for payment or approval

to Medicare, Tricare, and Department of Labor programs in violation of the False Claims

Act, 31 U.S.C. § 3729(a)(1)(A).

416.    The Total RX Defendants submitted these false claims to federal healthcare

programs with actual knowledge of their falsity, or with reckless disregard or deliberate

ignorance of whether or not they were false.

417.    By reason of these hundreds of false or fraudulent claims, the United States

has sustained damages in a substantial amount to be determined at trial, and is entitled to

treble damages plus a civil penalty for each false or fraudulent claim.

### FOURTH CAUSE OF ACTION
Violations of the False Claims Act:
Conspiracy
31 U.S.C. § 3729(a)(1)(C)

418.    The United States realleges and incorporates by reference each of the

preceding paragraphs as if fully set forth in this paragraph.

419.    By virtue of the acts described above, each of the Defendants conspired and

entered into an agreement to have the United States pay false or fraudulent claims.  In

particular, the Medoc Defendants agreed amongst themselves to leverage their control over the federal referrals generated by MSO physicians to extract kickbacks from pharmacies in violation of the AKS and profit from the submission of false claims to the United States. The Total RX Defendants joined in the agreement when they executed the sham employment agreement with Michael Schneider and worked with the Medoc Defendants to calculate the monthly kickbacks owed under the sham employment agreement, and when the Total RX Defendants worked with the Medoc Defendants to "show" control over Michael Schneider when he was not actually an employee of Total RX. Each of the Defendants knew that the purpose of their agreement was to submit kickback-tainted false claims to the United States. By transmitting kickbacks, signing sham agreements, and submitting claims to the United States, several overt acts were taken in furtherance of the conspiracy by the Defendants. Accordingly, each of the Defendants agreed and conspired to submit kickback-tainted claims for payment to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

420.    By virtue of the false or fraudulent claims that Defendants conspired to be made and/or caused to be made, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

## FIFTH CAUSE OF ACTION
Fraud

421.    The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

422.   The Total RX Defendants made materially false representations, including material omissions of fact, to the United States and/or its agents with knowledge of their materiality and falsity.

423.   The Medoc Defendants caused materially false representations, including material omissions of fact, to be made to the United States and/or its agents with knowledge of their materiality and falsity.

424.   Each of the Defendants intended that the United States would rely on these false representations and/or material omissions of fact.

425.   The United States did in fact rely on Defendants' false representations and material omissions of fact, and, as a result, paid money that otherwise would not have been paid.  Defendants each shared in these fraudulent proceeds, as they divided up the payments on claims for payments to federal healthcare programs first between the pharmacies (including the Total RX Defendants) and the Medoc Defendants, and then amongst the individual Medoc Defendants.

426.   The United States has suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

427.   The United States realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

428.   The United States asserts a claim under federal common law for recovery of monies by which Defendants Medoc Health Services, Kevin Kuykendall, Sabrina

Kuykendall, Mark Schneider, Michael Schneider, Moky Cheung, Michael Nguyen, and

Total RX have been unjustly enriched.

429.    By virtue of the conduct and the acts described above, each of the

Defendants were unjustly enriched at the expense of the United States in an amount to be

determined, which, under the circumstances, in equity and good conscience, should be

returned to the United States.

## SEVENTH CAUSE OF ACTION
Payment by Mistake

430.    The United States realleges and incorporates by reference each of the

preceding paragraphs as if fully set forth in this paragraph.

431.    By reason of the foregoing, the United States made and/or participated in

Medicare, Tricare, and DOL payments in reliance on the erroneous belief that the Total

RX Defendants were complying with the Anti-Kickback Statute and False Claims Act.

The erroneous belief was material to the United States' decision to make the payments.

Consequently, the United States is entitled to recover the amount of the payments in an

amount to be determined at trial.

## PRAYER FOR RELIEF AND JURY DEMAND

Accordingly, the United States respectfully requests judgment in its favor as

follows:

1.    As to the First, Second, Third, and Fourth Causes of Action (False Claims

Act), against Defendants for statutory damages in an amount to be established at trial,

trebled as required by law, and such penalties as required by law;

2.      As to the Fifth, Sixth, and Seventh Causes of Action (Fraud, Unjust

Enrichment, and Payment by Mistake), damages to the extent allowed by law;

3.      All costs associated with prosecuting this civil action, as provided by law;

4.      Interest on all amounts owed to the United States; and

5.      All other relief the Court deems just and proper, to be determined at a trial

by jury.

The United States demands a jury trial on all claims alleged herein.


Respectfully submitted this 19th day of July, 2019:


ERIN NEALY COX
UNITED STATES ATTORNEY

/s/ Richard J. Guiltinan
RICHARD J. GUILTINAN
Assistant United States Attorney
Texas Bar No. 24074332
KENNETH G. COFFIN
Assistant United States Attorney
Texas Bar No. 24076986
CLAY R. MAHAFFEY
Assistant United States Attorney
Wyoming State Bar No. 6-3355
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:  214-659-8600
Facsimile:   214-659-8807
richard.guiltinan@usdoj.gov
kenneth.coffin@usdoj.gov
clay.mahaffey@usdoj.gov

*Attorneys for the United States of America*